T. Morris Hackney appeals from a summary judgment in favor of First Alabama Bank ("FAB") on FAB's claim against Hackney for breach of a continuing guaranty agreement guaranteeing payment of a note executed by Banton, Inc., a corporation purchased by Hackney. Because we find that Hackney's affirmative defenses of fraud, lack of consideration, and mistake lack supporting evidence, we affirm the trial court's judgment.
Prior to Hackney's purchasing Banton, Inc., Banton Industries, Inc., a subsidiary of Banton, Inc., executed a promissory note in the amount of $500,000 in favor of FAB. Banton, Inc., and James Banton, the then-majority shareholder of Banton, Inc., executed guaranties on the note.
In May 1987, FAB conducted a financial analysis of Banton Industries and concluded that "[o]n an accrual basis Banton [Industries] appears to be profitable. Concern is expressed over the level of receivables and inventory indicated on the statements and the resulting borrowing needs." As a result of that financial analysis, FAB *Page 99 
placed Banton Industries on its "watch list" in order to more closely monitor the company's future financial performance. On October 6, 1987, another financial analysis was conducted on "Banton, Inc., and subsidiary." The report, in pertinent part, read:
 "Despite its strong profitability, Banton's cash position is relatively weak due to the company's accelerated growth rate. Net Cash Income declined from $1,659M in 1986 to $975M in 1987. This significant decline in NCI is due to:
 "(1.) An increase in the Average Collection Period from 201 days to 336 days.
 "(2.) A slowdown in inventory turnover from 335 days to 374 days.
"(3.) The aforementioned decline in net margins.
 "The slowing of receivables and inventory [is] obviously having a tremendous impact on the company, resulting in significant short-term borrowing needs and therefore increasing the leverage position. Although companies engaged in this type business often extend receivables on a dated basis, based on seasonality, the results attained by Banton appear to be excessive.
 "It is particularly disturbing to note that on a cash basis, Banton is unprofitable at the gross margin level. This means that all operating and overhead tax, and interest expense as well as current debt maturities and capital expenditures are financed not by internally generated cash but by external sources, primarily the short-term bank line. This has resulted in the debt/worth ratio increasing from 3.37:1 in 1985 to 6.45:1 in 1987.
"Summary
 "Banton is a very profitable company on an accrual basis, however, just the opposite is true when the real cash position of the company is analyzed. The level of receivables and inventory is of particular concern.
 "We have recognized a recovery of $500M on our Merry Tiller charge-off based on the $500M extension to Banton. The company did make its initial reduction of approximately $43M during September. Reductions are to be made semi-annually for the next six years.
 "Based on the highly leveraged condition of the company and its weak internal cash position, we should obtain quarterly financial statements on the company. In particular we should track the level of receivables, inventory and trade payables. We should also track the repayment of the stockholder loan. During the past year, this note was reduced by $50M, a period when cash was limited."
In October 1987, Sam Sumner, a business broker, contacted Hackney regarding the purchase of the outstanding capital stock of Banton, Inc. Sumner provided audited financial statements of Banton, Inc., from its inception through July 1987, and unaudited financial statements from August 1987 to October 1987.
After reviewing the financial information provided by Sumner and making additional inquiries, Hackney purchased the stock of Banton, Inc., on February 2, 1988. The stock sale agreement provided that Hackney would make arrangements for James Banton to be relieved of his personal liability on the Banton Industries note to FAB, the balance of which was $456,932.43. To fulfill this promise, Hackney executed a note on behalf of Banton, Inc., to FAB, for the amount due on the Banton Industries note, and executed an unconditional personal guaranty of said indebtedness.
Within approximately one month after the stock sale was closed, Hackney was informed, by an auditing firm he had employed, that, instead of a positive net worth of $1,000,000, Banton, Inc., in reality, had a negative net worth of $2,500,000.[1] Neither Banton, Inc., nor Hackney made any installments on the note. FAB sought collection of the debt from Hackney based upon his personal guaranty. *Page 100 
Upon Hackney's refusing payment of the note, FAB filed suit, seeking the principal due, plus accrued interest and attorney fees. Hackney pleaded, in his answer, the affirmative defenses of fraud, mistake, and lack of consideration. FAB filed a motion for summary judgment pursuant to Rule 56, A.R.Civ.P. Hackney amended his answer to include a counterclaim seeking rescission of the note and guaranty agreement, premised upon fraud and lack of consideration.[2] After hearing arguments, the trial court entered summary judgment in favor of FAB for the amount of principal owed and entered judgment in favor of FAB on Hackney's counterclaim pursuant to Rule 54(b), A.R.Civ.P. The trial court, on FAB's motion, amended its judgment to include accrued interest and attorney fees. The trial court, on Hackney's motion to reconsider, dismissed his counterclaim. From the judgment in favor of FAB and against Hackney on his counterclaim, Hackney appeals.
Hackney contends that FAB, by not disclosing the facts and conclusions contained in the financial analyses, suppressed material facts that FAB had a duty to disclose, thereby committing fraud in violation of Code 1975, § 6-5-101. He argues that, under the "particular circumstances" of this case, a duty to disclose arose. This argument was thoroughly addressed in Bank of Red Bay v. King, 482 So.2d 274 (Ala. 1984), where we held:
 "While the relationship between a bank and its customer has been traditionally viewed by courts as a creditor-debtor relationship which does not impose a fiduciary duty of disclosure on the bank, a fiduciary duty may, nevertheless, arise when the customer reposes trust in a bank and relies on the bank for financial advice, or in other special circumstances."
482 So.2d at 285.
In the instant case, it is clear from the record that Hackney did not repose trust in FAB or rely on it for financial advice. Nor do we believe that the circumstances of this case warrant the imposition of a duty on FAB to disclose the information contained in its financial analyses, because the circumstances discussed in Bank of Red Bay and in the cases cited therein are not present here. The only interaction between FAB and Hackney was through a Hackney representative who contacted an FAB representative to inform FAB of Hackney's purchase of Banton, Inc., and to instruct the FAB representative as to how Hackney wanted the loan (required to release James Banton from his personal guaranty under the Banton Industries note) structured. Neither Hackney, nor anyone on his behalf, requested any information from FAB regarding the financial strength or weakness of Banton, Inc., or its subsidiary, Banton Industries. Other than the loan involved in this appeal, Hackney has had no dealings with FAB. Furthermore, as illustrated by his testimony, Hackney had access to the same financial data that FAB used in preparing its analyses:
 "Q . . . [I]ncidently, the balance sheet that you've seen that came from First Alabama Bank in this discovery or from Cork and Ledbetter or from NBC, or subsequently from Borg-Warner, were all the same, were they not, as far as you know?
 "A I don't recall there being any substantial difference between them."
Therefore, we hold that FAB did not owe Hackney a duty to disclose the information contained in the financial analyses.
Hackney next contends that his liability under the guaranty agreement should be negated due to a mutual mistake of the parties. We find no merit to this argument. It is apparent from the record that FAB did not enter into the guaranty agreement under any mistaken belief. In response to Hackney's expressed desire to personally guarantee the Banton, Inc., note, FAB, after reviewing Hackney's financial statement, approved the loan with Hackney's personal guaranty. *Page 101 
If Hackney entered into the guaranty agreement on the basis of a mistake, it was a unilateral mistake. Restatement (Second)of Contracts § 153 (1979) states:
 "Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and
 "(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or
 "(b) the other party had reason to know of the mistake or his fault caused the mistake."
§ 154 provides:
"A party bears the risk of a mistake when
 "(a) the risk is allocated to him by agreement of the parties, or
 "(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
 "(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so."
No evidence appears of record indicating that FAB had any knowledge of the fraudulent conduct allegedly committed by James Banton. Nor is there any evidence that FAB had reason to believe that Hackney was acting under a mistaken belief in executing the guaranty agreement. The financial analyses prepared by FAB merely disclosed its concern regarding various aspects of the company, while at the same time acknowledging the company's strength if examined on an accrual basis and the fact that the installments on the note were current. Hackney himself acknowledged the fact that the nature of the business required the accumulation of large levels of receivables.
The risk in this case must be allocated to Hackney, for two reasons: 1) He was aware at the time of contracting that he had only limited knowledge concerning the subject of the contract, but he treated this knowledge as sufficient; and 2) it is reasonable under the facts of this case to place the risk on him. Hackney testified:
 "[W]e didn't really work out all the details of the contract until the end of December. So after the new year, we asked Cooper Lybrand to make — you know, to go out and start working and gathering information. And they began that process. You know, we were closing on an audit, so there was, you know, we didn't see any great urgency."
Furthermore, the following colloquy took place between Hackney and counsel for FAB:
 "Q I want to show you Defendant's Exhibit 3, the Banton, Inc., and Subsidiary Financial Review, which came from First Alabama Bank's records. On Page 2 of that document, there is a statement that there — it makes reference to an increase in the average collection period from 201 days to 336 days. The information pertaining to the aging of the receivables, is that information reflected on the financial statements of Banton, Inc., that you examined before you made your decision to purchase that stock?
"A Well, no, not directly.
 "Q Did you ever make that sort of an analysis; that is, an account receivable aging of Banton, Inc., before you purchased its stock?
"A Not in that detail.
 "Q The bank's report came to the conclusion that — I'm reading in part from Page 2 — 'All operating and overhead tax and interest expenses, as well as current debt maturities and capital expenditures are financed not by internally generated cash, but by external sources, primarily the short-term bank line.'
 "Were you aware of that fact before you bought Banton, Inc.'s stock?
 "A Well, I think that is a much more concise rendering than I was aware of myself."
Hackney, a businessman with years of experience, has purchased several other *Page 102 
businesses in a manner similar to that employed in this case. He was aware of the risks involved and chose to take those risks. As this Court held in the Western Grain Co. Cases,264 Ala. 145, 85 So.2d 395 (1955):
 "[W]hen parties have entered into a contract based upon certain or contingent events purposely as a compromise of doubtful claims arising from them, and there is an absence of bad faith, violation of confidence, misrepresentation, or concealment, if the facts upon which such agreement was founded or the event of the agreement itself, turn out very differently from what was expected or anticipated, this error, miscalculation or disappointment is not such a mistake as entitles the disappointed party to any relief, either by way of canceling the contract and rescinding the transaction or as a defense to a suit brought for its enforcement.
". . . .
 " '. . . [W]hen both parties are intelligent and fully capable of taking care of themselves and dealing at arms' length, with no confidential relations, . . . no duty to disclose exists when information is not requested, and . . . mere silence is then not a fraud. There must be active concealment or misrepresentation'; and, 'If there was a fraudulent concealment which induced the mistake, relief is available, whether it is called a "fraud" or a "mistake." But in the absence of such concealment or "other inequitable conduct" (not here alleged), relief is not available in either theory.' "
264 Ala. at 163, 85 So.2d at 413. We find no evidence of any "inequitable conduct" in this case.
Hackney contends that there was no consideration given in exchange for his executing the note on behalf of Banton, Inc., nor for his executing the guaranty agreement. He argues that, although FAB produced a cashier's check in the amount of the note, the funds were never transferred to Banton, Inc., nor made available to it. Furthermore, he contends that the check is nothing more than an entry on FAB's books. This argument is untenable. Upon Hackney's simultaneously executing the note on behalf of Banton, Inc., and the personal guaranty, FAB issued a cashier's check that was applied to pay off the Banton Industries note, thereby releasing James Banton from his personal guaranty as required by the stock sale agreement. It was unnecessary for the loan proceeds to physically change hands, because both the extinguished Banton Industries note and the new Banton, Inc., note were held by the same bank, FAB.
It is well settled that, although guaranty agreements must be supported by consideration, when such an agreement is made prior to, or contemporaneously with, the creditor's note, and both the agreement and the note are part of the same transaction, consideration rendered to the principal obligor is sufficient consideration to support a contract of guaranty.McMillan v. Dozier, 257 Ala. 435, 59 So.2d 563 (1952).
Finally, Hackney contends that the trial court erred in dismissing his counterclaim seeking rescission of the guaranty agreement premised upon fraud and lack of consideration. We disagree. After reviewing Hackney's answer asserting the affirmative defenses of fraud, mistake, and lack of consideration, and after reviewing his counterclaim, we find that the counterclaim raised no new arguments and was meritless. Hackney's counterclaim is essentially equivalent to his defenses raised in his answer. We have explained why under these facts, in light of the defenses argued, the summary judgment was warranted. Therefore, the trial court also correctly dismissed Hackney's counterclaim. SeeShearson/American Express, Inc. v. Mann, 814 F.2d 301 (6th Cir. 1987).
Therefore, we hold that, on the undisputed facts of this case, summary judgment was proper.
AFFIRMED.
HORNSBY, C.J., and ALMON, ADAMS and KENNEDY, JJ., concur.
[1] Hackney filed suit against James Banton, seeking rescission of the stock sale agreement based upon fraud. See Banton v.Hackney, 557 So.2d 807 (Ala. 1989).
[2] In essence, Hackney's counterclaim was a restatement of the defenses set forth in his answer. *Page 103