The appeal of the plaintiffs Roy and Jan Wilson (1910943), has been consolidated with the appeal of the plaintiffs Robert T. and Elizabeth W. Ryan (1910485), on motion of the Ryans. Both of these appeals are from a summary judgment in favor of the defendant, First Alabama Bank, as is that of the plaintiff Don Hogue Homebuilders, Inc. ("Hogue Builders") (1911092), whose appeal we shall address with the Wilson and Ryan cases, for purposes of review.
The plaintiffs purchased lots from a real estate developer. The developer had promised the plaintiffs that he would satisfy the indebtedness and obtain releases on the lots from a First Alabama mortgage on the development, but did not do so. The plaintiffs lost their lots when First Alabama later foreclosed on the developer's mortgage.
The records in the Wilson and Hogue Builders cases indicate the following additional and more specific facts pertinent to an understanding of these appeals.
James Davenport, a real estate developer, sought to develop a parcel of property into a residential subdivision, operating through Longleaf, Inc. The centerpiece of the Longleaf development was to be the Bissell House, a house already located on the parcel. The Bissell House, including its grounds, had been appraised at $1,010,000. It represented a substantial portion of the value of the parcel as a whole.
It was First Alabama's policy to require a current appraisal on properties like the parcel Davenport wanted to develop through Longleaf before lending money on them. Also, it was First Alabama's policy that its maximum loan amount for any such property would not exceed 75% of the value of the property.
Davenport sought financing for the Longleaf project in the spring of 1988, from First Alabama. First Alabama approved the Longleaf loan to Davenport for $3.5 million, without an appraisal on the parcel, and in an amount in excess of 75% of the value of the property as approximated by Davenport. Alford Sinclair, a banking expert who testified by affidavit for the Wilsons, stated that the approval of the Longleaf loan was not only contrary to First Alabama's own policies, but contrary to responsible banking practices.
This loan was recommended by Charles Watkins, as senior real estate loan officer at First Alabama, and was accepted by three First Alabama loan committees.
The records suggest that Davenport was a poor financial risk. The records also indicate that First Alabama had knowledge of his financial position. Both before and after the loan transaction with First Alabama, First Alabama was engaged in monitoring Davenport's First Alabama checking account activity for suspected check kiting. In addition, Davenport was frequently overdrawn on his First Alabama account. According to the records, Watkins was *Page 570 
aware of this recurring problem with Davenport and, indeed, often discussed the problem with him.
Watkins of First Alabama and Davenport had considerable other involvement, both before and after the loan transaction. For example, the flight log for Davenport's private airplane reflects that Watkins was a guest on Davenport's plane for a dozen trips between September 1987 and February 1989. The records indicate that in 1988, Watkins received a Rolex wristwatch from Davenport, and that Watkins received three cash payments totalling $8000 as purported fees from Davenport, allegedly for Watkins's advice on where to position some houses in another Davenport development. Watkins was a guest in Davenport's private box at Auburn University home football games in 1987 or 1988, and often during the late 1980's was a guest at Davenport's Gulf Coast condominium. In addition, Davenport helped finance out-of-state golf and hunting excursions for Watkins.
The records further indicate that First Alabama's president, William Jordan, and other First Alabama employees were aware of some of the trips Watkins had taken with Davenport's aid or as his guest.
In December 1988, months after the Longleaf loan transaction, Davenport sold the Bissell House property of the development for $400,000, a more than 60% loss, given the $1,010,000 appraisal. Despite the serious reduction in its security interest on the Longleaf development that this would represent, Watkins approved a release of the Longleaf mortgage as to the Bissell House property in exchange for a $400,000 payment to First Alabama on the Longleaf loan.
Also, by multiple transfers totalling nearly $400,000 of the Longleaf loan proceeds, money was diverted by Davenport to Davenport Companies, Inc. The records indicate that Watkins was aware of these transfers and that the Longleaf loan agreement provided that the Longleaf loan proceeds were to be used only for the Longleaf project. Watkins testified that Davenport Companies, Inc., did "very little" work on the Longleaf project.
In March 1989, Davenport met with Watkins to discuss Davenport's cash flow problems. During the same month, Davenport defaulted on the Longleaf loan. First Alabama did not foreclose.
Davenport testified that he spoke with Watkins a couple of times a week regarding contracts that he had in hand for the sale of Longleaf lots. Regarding such contracts, in May 1989 Davenport executed a sales contract for a Longleaf lot with the Ryans for $110,000, and one with the Wilsons for $100,000. The plaintiffs allege that as to these lots, and as to a lot later sold to Hogue Builders for $120,000, Davenport promised that he would obtain a release of each lot from the Longleaf mortgage. They also allege that Davenport promised to pay the proceeds of these sales to First Alabama on the Longleaf loan in an amount representing the value of First Alabama's security interest in the lots.
The Wilson, Ryan, and Hogue Builders transactions were all closed in-house by Davenport between June 5, 1989, and June 12, 1989. These buyers were given warranty deeds. The records indicate that Watkins was aware that Davenport was closing loans in-house.
In July 1989, an attorney for other purchasers of a Davenport property wrote to First Alabama. That attorney notified First Alabama that Davenport had sold his clients property on the misrepresentation that he would satisfy a First Alabama mortgage applicable to that property and would obtain a release from the mortgage (which he did not do).
By a letter dated July 31, 1989, counsel for First Alabama notified Davenport that First Alabama was aware of similar irregularities in the sale of yet another Davenport property.
It appears from the records that Davenport would sometimes take proceeds from the sale of a lot and, rather than paying the proceeds to First Alabama to obtain a release of the lot, would direct the proceeds toward other debts. Eventually, the Wilsons, the Ryans, and Hogue Builders discovered that Davenport had never satisfied *Page 571 
the indebtedness specific to their lots and that, accordingly, no releases had been obtained.
However, during July and August 1989 Davenport paid approximately $650,000 on various First Alabama loans.
On August 9, 1989, Davenport met with Watkins and counsel for First Alabama regarding his selling lots without obtaining releases. On that day, Davenport also wrote to Watkins, stressing his recent $650,000 in payments and asking Watkins's patience while he tried to work everything out. Davenport said: "[P]lease bear with me and allow me to function in the community so that we might all come out whole."
Approximately four months passed. Until December 1989, First Alabama did not report Davenport's activity to authorities. Until November 1989, First Alabama had continued to do business with Davenport. Thereafter, as the First Alabama and Davenport relationship soured, First Alabama instituted foreclosure action on the Wilson, Ryan, and Hogue Builders lots.
The Ryans, the Wilsons, and Hogue Builders all sued First Alabama, alleging that the relationship between First Alabama and Davenport as to Longleaf was such that First Alabama was liable to them for the loss of their purchase money. They made claims based, in pertinent part, on theories of breach of contract, negligence, and a civil conspiracy to defraud. The trial court granted First Alabama's motions for summary judgment against the Wilsons and Hogue Builders.
A final judgment was entered against the Ryans on a Rule 12(b)(6), Ala.R.Civ.P., motion by First Alabama, which the trial court, sua sponte, treated as a motion for summary judgment. However, the Ryans state, and the record reveals, that they were given no notice by the trial court that it intended to treat First Alabama's motion to dismiss as a motion for summary judgment. This failure to give notice is prejudicial and reversible error. Hales v. First Nat'l Bank ofMobile, 380 So.2d 797 (Ala. 1980).
As to the remaining issues, the arguments of Hogue Builders mirror those of the Wilsons, just as, in pertinent part, the Hogue Builders record mirrors the Wilson record. Therefore, we need not address these arguments separately. We will discuss these issues as they are ably examined by the Wilsons and First Alabama, but our discussion shall have equal applicability to Hogue Builders.
As to the breach of contract and negligence claims, we agree with First Alabama that the trial court ruled correctly in the Wilson and Hogue Builders cases. First Alabama made a prima facie showing that there was no genuine issue of material fact as to those claims and that it was entitled to a judgment as a matter of law as to those claims, and the Wilsons and Hogue Builders did not rebut that showing. A summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. Ala.R.Civ.P. 56(c). Accordingly, the summary judgments were proper as to those claims.
One moving for summary judgment has the burden of showing, prima facie, that there is no genuine issue of material fact.Schoen v. Gulledge, 481 So.2d 1094 (Ala. 1985). If the movant makes such a showing, then the burden shifts to the nonmovant to demonstrate, by "substantial evidence," the existence of an issue of material fact. Id.; § 12-21-12, Ala. Code 1975. Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989).
Our review of such a judgment is de novo. Hightower Co. v.United States Fidelity Guar. Co., 527 So.2d 698 (Ala. 1988). Moreover, in examining the question of whether the nonmovant has rebutted a prima facie showing of the absence of a genuine issue of material fact, we must review the evidence in a light most favorable to the nonmovant, resolving all reasonable doubts against the movant.
As to their claim of breach of contract, the Wilsons assert that Davenport was merely an instrumentality of First Alabama. *Page 572 
Therefore, they say, First Alabama is an imputed party to their real estate sales contract with Davenport. They aver that this contract was breached.
However, after thoroughly reviewing the record in the Wilson case, we are unpersuaded by the Wilsons' arguments that one could reasonably infer from the evidence that Davenport was merely an instrumentality of First Alabama in the real estate contract transaction. See Twine v. Liberty Nat'l Life Ins. Co.,294 Ala. 43, 311 So.2d 299 (1975); North Carolina Mut. LifeIns. Co. v. Holley, 533 So.2d 497 (Ala. 1987) (discussing the relationships required between parties in order for one to maintain a lawsuit for breach of contract). Accordingly, we hold that the trial court properly entered a summary judgment on the Wilson contract claims.
On the negligence claim, the Wilsons argue that First Alabama, through Watkins, was violating a state banking statute, Ala. Code 1975, § 5-6A-22, which prohibits the acceptance of bribes by bank officials. The Wilsons state that First Alabama was negligent per se, because, they say, Watkins was violating this provision. Without suggesting that Watkins was or was not violating the provision, we disagree.
Section 5-6A-22 provides, in pertinent part:
 "Any officer, director, or employee of a bank who willfully and knowingly . . . asks, receives, consents or agrees to receive any commission, emolument, gratuity, or reward or any promise of any commission, emolument or reward, or any money, property or thing of value or of personal advantage in procuring or endeavoring to procure for any person, firm or corporation any loan from . . . such bank is guilty of a misdemeanor."
A critical element of negligence per se is that the statute violated have been enacted to protect a class of persons that includes the litigant. Fox v. Bartholf, 374 So.2d 294, 295
(Ala. 1979). Here, it is evident that the statutory language alleged to have been violated was intended to protect, for example, depositors who can be harmed by "bad loans" that might be induced by bribes, because such loans can lead to bank failures. Clearly, this provision does not exist to protect a person from buying encumbered property on the untruthful promise that the encumbrance would later be removed. Moreover, such a person is not brought within the class protected by this language simply because the encumbrance in question is security on what turns out to be a bad loan.
In sum, we affirm the summary judgments in the Wilson and Hogue Builders cases (1910943 and 1911092) as to the negligence and breach of contract claims. We reverse the summary judgment in the Ryan case (1910485) in toto. This leaves for our resolution the Wilson and Hogue Builders civil conspiracy claims; on these claims, we reverse.
The crux of the fraud allegations on the conspiracy claims of the Wilsons and Hogue Builders is that their money was taken on false pretenses, effectively stolen — that it was not paid to First Alabama to secure the release of their lots as promised.
The Wilsons allege that First Alabama acted in conjunction with Davenport in order that the plaintiffs' money would be fraudulently diverted to the benefit of Davenport and First Alabama and that First Alabama was a conspirator in Davenport's fraud.
The judge in the Wilson case stated that, seemingly, "[the] plaintiff makes a showing of some species of culpability on the part of [First Alabama]." He went on to conclude, however, that the "court can find no authority" upon which the Wilsons would be entitled to relief.[1]
This latter statement sums up the position of First Alabama. It argues essentially, that even if a factfinder resolves every allegation in favor of the plaintiffs, they still cannot prevail, because, as a matter of law, First Alabama says, it had no *Page 573 
legal duty to them. We disagree. For example, as to the Wilsons and Hogue Builders, First Alabama was clearly under a legal duty not to knowingly aid Davenport in a fraudulent diversion of the purchase money so that it was not used to obtain a release of their lots; not to knowingly receive money stolen from the Wilsons and Hogue Builders; and not to alienate any money so stolen to its and Davenport's benefit.
A civil conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. Eidson v. Olin Corp., 527 So.2d 1283
(Ala. 1988). The conspiracy does not supply the cause of action. It is the end of the conspiracy, the wrong sought, that is the gist of the action. Tapscott v. Fowler, 437 So.2d 116
(Ala. 1983).
Recall that during July and August 1989, First Alabama accepted from Davenport payments totalling approximately $650,000. The Wilsons and Hogue Builders had paid for their lots in June 1989. Viewed most favorably to the Wilsons and Hogue Builders, the record suggests that their purchase money, which was supposed to have been used to secure the release of their lots, was held by Davenport and that it later constituted part of the $650,000 payments to First Alabama. There is also evidence from which one could reasonably infer that at the time of the payments in July and August, First Alabama had actual knowledge that it was accepting monies that had been, in effect, stolen, and that it accepted these monies to render itself a benefit by reducing the Longleaf indebtedness, at the plaintiffs' expense. Davenport enjoyed a reduction in his debts, and First Alabama enjoyed a repayment of Davenport's debts while retaining a security interest in the Wilson and Hogue Builders lots.
We conclude that this evidence constituted substantial evidence in support of their conspiracy claims. Therefore, the summary judgment was not proper on the conspiracy claims in the Wilson and Hogue Builders cases.
Because we so hold, it is not necessary for us to address other additional evidence on these conspiracy claims discussed by the Wilsons and Hogue Builders, although that evidence may be relevant at trial.
1910485 REVERSED AND REMANDED.
1910943 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
1911092 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
SHORES and KENNEDY, JJ., concur.
HORNSBY, C.J., and ADAMS and INGRAM, JJ., concur in the result.
[1] Indeed, the Wilson and Hogue Builders cases present peculiar (and complex) factual situations, making them difficult to categorize in terms of a cause of action. They also present situations in which the plaintiffs' own actions can obscure potential liability by First Alabama; the plaintiffs exhibited very poor judgment in a transaction of some magnitude. The record indicates, for example, that although the Wilsons were aware of Davenport's financial difficulties, none of the checks they tendered as payment for the purchase of their lot named First Alabama as a payee. Apparently none of the plaintiffs made prompt efforts to determine whether, in fact, Davenport had obtained a release of their lot from the First Alabama mortgage. There is no evidence to suggest that any of the plaintiffs sought professional advice or assistance in these transactions, but relied on Davenport to close these sales.
The Wilsons also have the unsavory distinction of having had the purchase price for their lot untruthfully inflated by $30,000 on their deed and closing statement. First Alabama discusses related matters that suggest that this was part of an effort by Mr. Wilson to unlawfully reduce the Wilsons' future tax liability.