656 So.2d 340 (1994)
Joe Brown DUCKWORTH, et al.
v.
NATIONAL BANK OF COMMERCE, et al.
1930416.
Supreme Court of Alabama.
December 22, 1994.
Rehearing Denied February 17, 1995.
*341 Michael D. Smith of Hubbard, Smith, McIlwain & Brakefield, P.C., Tuscaloosa, for appellants.
Patricia Clotfelter of Berkowitz, Lefkovits, Isom & Kushner, Birmingham, for David Farr.
L. Graves Stiff III of Starnes & Atchison, Birmingham, for Nat. Bank of Commerce.
PER CURIAM.
Joe Brown Duckworth and eight other investors, hereinafter "the Tuscaloosa Group," appeal from a judgment based on a directed verdict against their claims alleging breach of contract and fraud against National Bank of Commerce and others. The issue is whether the plaintiffs presented sufficient evidence of fraud by the Bank to survive the directed verdict motion.[1]
The evidence, viewed in a light most favorable to the plaintiffs, indicates the following. Jim Davenport, a real estate developer, approached the Tuscaloosa Group in an effort to raise money for a real estate development project, the Buckhead subdivision in Vestavia Hills, Alabama. In March 1989, Davenport convinced the Tuscaloosa Group to advance him $175,000. In consideration for this investment, Davenport offered to give the Tuscaloosa Group a promissory note for $225,000. The Tuscaloosa Group wanted some security in return for the investment. Duckworth agreed to a proposal that pledged five lots in the subdivision as security for the investment. This agreement was arranged as an option to purchase the five lots if Davenport defaulted on the promissory note. The Tuscaloosa Group demanded that Davenport obtain the consent of National Bank of Commerce, the holder of a first mortgage on the Buckhead subdivision property.
After the Tuscaloosa Group had met with Davenport to discuss the transaction, Davenport *342 approached Duckworth, the designated spokesperson for the Tuscaloosa Group, with a document entitled "AGREEMENT." The document acknowledged the $175,000 investment made by the Tuscaloosa Group. The Agreement identified the $175,000 as a down payment on the five lots in the Buckhead subdivision. The Agreement further provided for the Tuscaloosa Group to pay an additional $175,000 and receive title to the five lots. Among other representations, Davenport assured Duckworth that the Bank knew all of the facts about the transaction and had consented to the transaction.
The Agreement, dated March 31, 1989, was signed by Davenport individually and in his capacity as president of Buckhead, Inc., a corporation owned by Davenport. At the bottom of the document was the heading "CONSENT," below which was a sentence reading: "National Bank of Commerce hereby consents to the terms and conditions of the Agreement between Buckhead, Inc., and Purchasers set forth herein." This paragraph was ostensibly signed by David Farr as vice president of National Bank of Commerce. However, in reality Farr's signature had been forged by Davenport's secretary at Davenport's direction.
After receiving this Agreement, the Tuscaloosa Group advanced Davenport the $175,000. After advancing the money to Davenport, Duckworth sent a letter, dated April 18, 1989, to Farr at National Bank of Commerce, thanking him for his assistance in the transaction. The letter from Duckworth included an executed copy of the Agreement but did not contain a copy of the $225,000 promissory note. Farr immediately noticed that his purported signature had been placed on the document and knew that the writing was not his signature. Farr did not notify Duckworth, or any member of the Tuscaloosa Group, about the forged signature, despite the fact that the letterhead on which the letter was written contained both Duckworth's telephone number and his address.
Farr asked Davenport about the document shortly after he received it in April 1989. Davenport told Farr that the Tuscaloosa Group wanted the Bank's consent to the arrangement and that he did not think that Farr would mind. Farr told Davenport that if Davenport would get the original document back then he would attempt to get the Bank's proper signature. Davenport did not get the document to Farr.
On July 26, 1989, National Bank of Commerce lent Davenport an additional $200,000 on the Buckhead subdivision development. National Bank of Commerce obtained an agreement from the holder of the second mortgage on the Buckhead property to subordinate the second mortgage to National Bank of Commerce lien securing the additional $200,000 loan. National Bank of Commerce, however, did not notify the Tuscaloosa Group of this additional lien against the Buckhead development, even though the Bank knew the Tuscaloosa Group expected to obtain clear title to the five lots.
No further action was taken with respect to the Agreement until approximately December 1989, when Farr's superiors at the Bank asked him if the signature on the document was his. Farr told them that the signature was not his and that he had never seen the document before. Approximately a year and a half later, Farr admitted to his superiors that he had seen the document in April 1989.
Davenport spent the $175,000 and subsequently defaulted on the promissory note, which was due either on December 31, 1989, or when the five lots were sold. The Tuscaloosa Group received no money from Davenport, and it was unable to obtain releases for the five lots.
Davenport's business collapsed in late 1989, and he eventually filed a bankruptcy petition.
The Tuscaloosa Group sued National Bank of Commerce, Farr, Davenport, and his wholly owned corporation, Buckhead, Inc.,[2] alleging breach of contract and fraud, based on the Bank's failure to honor the Agreement by conveying title upon payment of an additional *343 $175,000 and based on its failure to notify the Group that the signature was fraudulent as soon as Farr, the Bank's agent, became aware of the forged signature in April 1989. The fraud count alleged suppression and conspiracy. The cause proceeded to trial against the Bank and Farr, and the circuit court granted a motion for a directed verdict at the close of the plaintiffs' evidence, stating that the document entitled "Agreement" placed no burden on the Bank to release the lots upon the Group's tendering the additional $175,000 and that the Bank owed no duty to the Tuscaloosa Group.
The Tuscaloosa Group argues that National Bank of Commerce is liable for the fraud perpetrated by Davenport. The Tuscaloosa Group contends that the Bank ratified the fraud perpetrated by Davenport and accepted a benefit from the fraud by collecting from Davenport nearly $2,000,000 in principal reduction payments after the Bank was aware that the plaintiffs had been defrauded. The evidence tended to show that Davenport used a large portion of the $175,000 to cover large overdrafts in Davenport's business and personal accounts at the Bank.
The Bank claims that it made no representations to the Tuscaloosa Group and, therefore, that it cannot be liable for fraud. Further, the Bank asserts that the document, even if it had been properly executed by the Bank, would not have obligated the Bank to release the lots that were pledged as security for the $175,000 advancement.
In reviewing a judgment based on a directed verdict, a court must view the evidence in a light most favorable to the nonmoving party, and if there is any interpretation that can support a conclusion in favor of the nonmoving party, the court must reverse. Ex parte Hicks, 537 So.2d 486 (Ala.1988).
This case is very similar to the case of Ryan v. First Alabama Bank, 620 So.2d 568 (Ala.1993). Ryan involved this same real estate developer, Davenport. In Ryan, the plaintiffs paid Davenport for some lots in a subdivision under the belief that Davenport would pay First Alabama Bank the amount necessary to secure a release of those lots. The plaintiffs paid for the lots in June 1989. Davenport did not use the money he received from these lots to obtain the contemplated releases. In July 1989 First Alabama Bank was notified by a third party that Davenport was selling lots under the representation that he would obtain releases from First Alabama but was not obtaining the releases. First Alabama continued to collect funds from Davenport through December 1989 to reduce his capital debt. First Alabama then foreclosed on the plaintiffs' lots because Davenport had defaulted on his debt and the lots had never been released from First Alabama's mortgage.
The Ryans brought an action against First Alabama, alleging breach of contract, negligence, and civil conspiracy to defraud. These claims were predicated upon the theory that First Alabama had a duty not to knowingly accept funds that had been stolen from the plaintiffs, not to retain monies that it knew had been stolen from the plaintiffs, and not to benefit from the fraud perpetrated upon the plaintiffs. The circuit court in Ryan entered a summary judgment for First Alabama, but this Court reversed the summary judgment as to the count alleging civil conspiracy to defraud. The Ryan decision emphatically stated:
"First Alabama was clearly under a legal duty not to knowingly aid Davenport in a fraudulent diversion of the purchase money so that it was not used to obtain a release of their lots; not to knowingly receive money stolen from the [plaintiffs]...; and not to alienate any money so stolen to its and Davenport's benefit."
Ryan, 620 So.2d at 573.
Just as the Court held that First Alabama owed a duty in Ryan, we hold that National Bank of Commerce had a duty not to allow the forgery of its officer's signature to remain undisclosed. National Bank of Commerce continued to receive money from Davenport after it knew or had notice that the plaintiffs had been defrauded. The facts of this case are even more compelling than the facts of Ryan, in that the Bank received notice of Davenport's actions directly from the plaintiffs and in that Davenport's fraud involved a forgery of the signature of an officer of the Bank. Further, in this case *344 National Bank of Commerce received this notice much sooner than First Alabama received notice in Ryan. The Bank's failure to notify the Tuscaloosa Group constitutes a breach of duty, whether it is considered a ratification of Davenport's fraud, a suppression of the forgery of its vice president's signature, or a conspiracy with Davenport.
The circuit court directed a verdict based on its conclusion that the Agreement and the Consent did not impose a binding obligation on the Bank. Such a binding obligation is not essential to a finding of liability on the part of the Bank and Farr. The Bank knew in April 1989 that the Tuscaloosa Group had advanced $175,000 to Davenport and that the Group had an option to purchase the five lots for an additional $175,000. The Bank knew that the purported signature was a forgery. A simple reading of the document shows that the Tuscaloosa Group advanced money as a down payment and expected to be able to obtain clear title to the lots upon paying another $175,000. The Bank should have known that, if the forged signature was on a document indicating that the Bank consented to a financial transaction that at least appeared to require it to release its liens on the lots upon the payment for them by the Tuscaloosa Group, the Group might have justifiably relied upon that signature. The Bank was not free to sit idly by and collect nearly $2,000,000 in payments from Davenport when it knew that the Tuscaloosa Group had advanced $175,000 to Davenport and that the Agreement made pursuant to that transaction bore a forged signature purporting to acknowledge the consent of the Bank. With prompt notice, the Tuscaloosa Group could have sought rescission of the contract with Davenport and perhaps could have recovered some of its $175,000 loss.
For the foregoing reasons, the circuit court erred in directing a verdict for the Bank and Farr on the fraud claim. Accordingly, the judgment based on that directed verdict is reversed, and the cause is remanded for a new trial.
REVERSED AND REMANDED.
ALMON, SHORES, KENNEDY, INGRAM and COOK, JJ., concur.
HOUSTON, J., concurs in the result.
HOUSTON, Justice (concurring in the result).
What affirmative duty of disclosure does a bank owe to third parties regarding its customers? None. I believe this Court answered this question in Reynolds v. McEwen, 416 So.2d 702 (Ala.1982); Cahaba Seafood, Inc. v. Central Bank of the South, 567 So.2d 1304 (Ala.1990); and Hackney v. First Alabama Bank, 555 So.2d 97 (Ala.1989). In fact, financial institutions have a duty to maintain the confidentiality of their customers.
There is no evidence that Davenport was an agent of Farr or of National Bank of Commerce when Davenport entered into the agreement with Duckworth and the Tuscaloosa Group or when Davenport's secretary forged Farr's name. A ratification takes place when a principal, having knowledge of the material facts surrounding his agent's unauthorized transaction, retains the benefits resulting from the transaction. CIT Financial Services, Inc. v. Bowler, 537 So.2d 4, 5 (Ala.1988), and cases cited therein.
However, one of the two causes of action alleged was conspiracy between the bank and its customer to defraud the Tuscaloosa Group. I cannot distinguish that aspect of this case in any material way from Ryan v. First Alabama Bank, 620 So.2d 568, 572-73 (Ala.1993). Therefore, I agree that this action should have been submitted to the jury for resolution.
NOTES
[1] The breach of contract count is not at issue on appeal.
[2] The action was stayed as to Davenport and Buckhead, Inc., because of Davenport's bankruptcy action.