[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1268 
The plaintiffs, Billie Jo Smith and Thomas L. White, appeal from summary judgments entered in favor of the defendants, First Family Financial Services, Inc. ("First Family"); EquiSouth Financial Services, Inc. ("EquiSouth"),[1] Thomas Buce, Jr. (an employee of EquiSouth); and Cambridge Title Agency, Inc.,[2] in an action charging them with legal fraud and conspiracy to commit legal fraud in a loan transaction.
Alabama Code 1975, § 6-5-102, codifies the common law and recognizes an action for fraud where one with a duty to disclose conceals or withholds a material fact. The Alabama Consumer Credit Act, § 5-19-1 et seq., makes material all finance charges payable directly or indirectly by the borrower as an incident to credit. Section 5-19-4(g) permits a creditor, by contract in a consumer loan transaction secured by an interest in real property, to charge and collect points, in addition to all finance charges, in an amount not to exceed five percent of the original principal balance. The plaintiffs contend that, under the facts in this case, the defendants had a duty to disclose all finance charges imposed in the loan transaction between the plaintiffs and the defendants, and that the defendants breached that duty by concealing the total amount of finance charges incurred by the plaintiffs in the transaction. They also charge that the defendants violated §5-19-4(g) by charging them more than the amount permitted by that statute, and that the defendants entered into a scheme to conceal from them that they were doing so. They also contend that the defendants' failure to disclose all finance charges violates the Alabama Deceptive Trade Practices Act, § 8-19-1 et seq.
First Family is a residential mortgage lender. Traditionally, residential mortgage lenders made loans to borrowers directly from offices maintained with employees of the lender that originated, processed, and underwrote such loans. In recent years, a number of wholesale mortgage lending programs have evolved whereby mortgage lenders purchase loans from other lenders or from mortgage brokers who have completed all of the origination work. Mortgage lenders regularly purchase wholesale closed loans made by other mortgage lenders. *Page 1269 
In addition to buying closed loans at wholesale, mortgage lenders also acquire loans through mortgage brokers. Mortgage brokers originate and process loans that the mortgage lender then purchases from the mortgage broker. The arrangement between the mortgage lender and the mortgage broker varies, but generally the closing of the loan is arranged by the mortgage broker in the name of the mortgage lender.
Another method reflects the arrangement between EquiSouth and First Family in this case. Under this arrangement, the mortgage broker or correspondent lender performs all of the originating functions and closes the loan in the name of the mortgage broker with funds supplied by the mortgage lender. The mortgage broker depends upon "table funding," the simultaneous advance of the loan funds from the mortgage lender to the mortgage broker. Once the loan is closed, the mortgage broker immediately assigns the mortgage to the mortgage lender. The essence of the table funding relationship is that the mortgage broker identifies itself as the creditor on the loan documents even though the mortgage broker is not the source of the funds.
Beginning in September 1988, First Family began a correspondent lending program utilizing mortgage brokers or correspondent lenders to originate its loans in Alabama. Under this arrangement, the brokers or correspondent lenders do all of the origination work on loans and submit the applications to First Family. First Family, the mortgage lender, does not bear the cost of maintaining offices and employees to originate its loans under this arrangement. If approved by First Family, the loans are closed in the name of the mortgage broker with funds supplied by First Family.
The plaintiffs in this case assert that First Family's correspondent lending program, while facially legitimate, was a scheme to avoid the letter and spirit of the 5% cap on mortgage origination fees under § 5-19-4(g). The plaintiffs argue that, under Alabama law, the defendants were required to disclose all material facts; that all finance charges are material facts; that all mortgage origination fees are a material fact; that the failure to disclose those facts amount to fraud under Alabama law under the facts of this case; and that the scheme set up by First Family and EquiSouth violates the Alabama Deceptive Trade Practices Act. The plaintiffs also contend that First Family's correspondent lending program was a combination between First Family and EquiSouth to conceal from borrowers such as the plaintiffs the wrongs alleged, which combination the plaintiffs allege constitutes a civil conspiracy under Alabama law.
EquiSouth was designated a correspondent lender by First Family in August 1989. Sometime thereafter, EquiSouth's employee Thomas Buce and the plaintiff, Billie Jo Smith had discussions regarding a mortgage loan. Smith's house was destroyed by fire on January 4, 1989, and, with proceeds from fire insurance, she had purchased a shell house which was moved onto the lot where her house had previously stood. She needed a loan to enable her to complete the shell house. Buce submitted her loan application to First Family, which initially turned it down. Buce suggested that she get a cosigner on the note. Her brother, the plaintiff Thomas L. White, agreed to cosign the note and loan application. When the loan application was resubmitted to First Family with White's participation, First Family issued a conditional loan commitment. The commitment provided that First Family would lend the money to Smith and White at an interest rate of 16% per annum. Under First Family's arrangement with EquiSouth, EquiSouth was permitted to add an additional 2% as a mortgage broker origination fee. The loan was to be closed with funds furnished by First Family and in the name of EquiSouth, which was to immediately assign the note and mortgage to First Family. This compensation to the mortgage broker of yield spread premiums is a cost of the loan to the borrower, and it was not disclosed to the plaintiffs. An origination fee of 5% of the original principal was disclosed. It is the plaintiff's contention that Alabama law required the disclosure of all finance charges; that the yield spread premium was a part of such charges; and that because it was also an origination fee paid to EquiSouth, EquiSouth *Page 1270 
collected more than the 5% origination fee permitted by Alabama law.
As agreed, EquiSouth assigned the mortgage to First Family simultaneously with the execution and recording of the mortgage. First Family notified Smith and White to make their payments directly to First Family. Smith and White made very few payments before they defaulted. First Family initiated foreclosure proceedings. Smith and White subsequently filed this action, seeking money damages for alleged fraud, breach of a fiduciary duty, conspiracy, and harassment.[3]
The case came on to be tried. Just before the trial began, the trial court entered a summary judgment in favor of EquiSouth's employee, Thomas Buce. Trial commenced on June 8, 1992, and the next day, before the close of the plaintiffs' evidence, the trial court granted First Family's motion for a summary judgment on all remaining claims against First Family. The plaintiffs appealed the summary judgments for the defendants.
The plaintiffs maintain: (1) that the defendants committed legal fraud and conspired to commit legal fraud against them in regard to undisclosed mortgage broker fees and charges incurred by them in the loan transaction; (2) that First Family's correspondent lender program was a scheme to avoid the letter and spirit of the 5% cap on mortgage origination fees under Alabama Code 1975, § 5-19-4(g); (3) that First Family was required to disclose the material facts in that it violates the Alabama Deceptive Trade Practices Act and that, further, First Family was under a duty to disclose because of the particular circumstances of this case; (4) that First Family's correspondent lender program was a combination between First Family and its broker to do the wrongs alleged, which combination constituted a civil conspiracy under Alabama Law; and (5) that the defendants breached their fiduciary duty by seeking a loan for the plaintiffs that contained terms and conditions that would benefit themselves to the detriment of the plaintiffs.
On March 11, 1989, Act No. 88-87 was approved, with an effective date of June 30, 1988. Act No. 88-87 amended §5-19-4, part of the Alabama Consumer Credit Act ("Mini-Code"), to provide for a five percent limitation on mortgage loan origination fees. The provision is codified at Alabama Code 1975, § 5-19-4(g), as amended. The plaintiffs claim that, a few months after the effective date of § 5-19-4(g), First Family implemented its correspondent lender program with the aim of permitting a mortgage broker participating in the correspondent lender program to receive fees for originating a consumer loan substantially in excess of the five percent limitation. The plaintiffs argue that this was done through means of the yield spread premium, which resulted in the mortgage broker's receiving more than a five per cent origination fee. The yield spread premium in this case amounted to $2,880.11 and was paid to EquiSouth out of the loan proceeds that were supplied by First Family. Indisputedly, the yield spread premium was a part of the cost of the loan borne by the borrowers. First Family allows a broker participating in the correspondent program to increase the interest rate that the borrower will be charged for origination of the loan through means of spread of up to two percent of the gross amount of the loan. In this instance, it allowed EquiSouth to increase the rate quoted to the borrower from 16% to 18%. The spread stems from the two percentage-point difference between First Family's 16% "buy rate" and the 18% rate on the note. Under the correspondent lender program, First Family pays 75% of the present value calculation of the spread to the correspondent lender (EquiSouth) at the time the loan is purchased. The other 25% of the spread is retained by First Family. The borrower pays 100% of the 2% spread over the life of the loan.
First Family and EquiSouth do not dispute the fact that an origination fee of 5% of the loan plus $2,880.22 (75% of the spread paid to EquiSouth) was charged and paid for by the borrowers at the loan closing. They do not *Page 1271 
dispute that the transaction is a consumer loan transaction governed by the Mini-Code. The Mini-Code (§ 5-19-1(1)) defines "finance charge" as including all charges "imposed directly or indirectly," including points or other charges, "however denominated."
The Alabama Mini-Code has been described as Alabama's consumer protection legislation in the area of consumer finance. It is expressly applicable to real estate transactions. Fletcher v. Tuscaloosa Fed.Sav. Loan Ass'n,294 Ala. 173, 314 So.2d 51 (1975). This legislation requires full disclosure of all finance charges, whether direct or indirect, and by whatever designation. Alabama Code 1975, § 5-19-1;Berryhill v. Rich Plan of Pensacola, 578 F.2d 1092 (5th Cir. 1978).
Alabama Code 1975, § 5-19-4(g), provides:
 "(g) Notwithstanding the provisions of this or any other section of this chapter, a creditor may, pursuant to contract, in a consumer loan or consumer credit sale secured by an interest in real property, charge and collect points in an amount not to exceed five percent of the original principal balance in the case of a closed-end loan or credit sale, or five percent of the total line of credit in the case of an open-end credit plan. Points may be paid in cash at the time of the loan or credit sale, or may be deducted from the proceeds and included in the original principal balance. Points shall be in addition to all other charges and are fully earned on the date of the loan or credit sale and may be excluded from the finance charge for the purpose of computing the finance charge refund."
The defendants, understandably, do not challenge the plaintiffs' assertion that the five percent origination fee and the two percent yield spread premium were finance charges as defined in the Mini-Code, being, as they are, charges imposed directly on the borrower, including points and all other charges, "however denominated." They contend, however, that the key language in the statute is the phase "fully earned." They argue, implausibly, that because the statute states that points are fully earned (from the standpoint of the mortgage broker) and may be excluded from the finance charge for the purpose ofcomputing the finance charge refund, the spread yield premium should not be considered points or finance charges since it would not be included in computing a finance charge refund in the event the loan was paid off prematurely.
The statutory definition of points, in § 5-19-4(g), does not require that they be "fully earned on the date of the loan" as this argument contends. To the contrary, § 5-19-1(1) defines "finance charge" as including every charge imposed on the consumer whether "directly or indirectly," by whatever designation. Section 5-19-4(g) merely states that, for purposes of computing a finance charge refund, points, being fully earned on the date of the loan, may be excluded.
That this is so does not change the nature of the spread yield premium. It is a part of the origination loan fee paid to the mortgage broker on the front end of the loan. It is a cost of borrowing money, defined as a "finance charge" under the Mini-Code. It is a material fact that the borrower is entitled to know before completing the loan closing. It is a material fact that a mortgage broker has an obligation to disclose to a borrower.
The Mini-Code is not merely a rate-regulating statute. It, like most consumer legislation, largely permits market forces to operate with regard to rates, but requires full disclosure to the consumer of the total cost of the loan.
First Family argues that it was free to charge the plaintiffs any rate of interest that did not violate the usury laws, and that there is no allegation of a usury law violation in this case. We agree with this contention. However, the fact that this is so did not relieve First Family or EquiSouth from disclosing to the borrowers the actual finance charges they were undertaking. The Mini-Code was subject to several amendments in the 1988 session of the legislature. "Finance charge" was broadly defined to include all charges, "however denominated." Section 5-19-4(g) permitted a creditor, by contract, in a consumer loan secured by an interest in real property, to charge and collect points in an amount not to exceed five percent of the original principal balance. *Page 1272 
The new legislation provided that such fees were fully earned on the date of the loan, that is, were nonrefundable, and were not to be included in computing finance charge refunds. This settled the debate with regard to whether origination fees were legal under the Mini-Code and settled the question with respect to whether prepaid origination fees could legally be made nonrefundable. The amendment did not, however, relieve the lender of the obligation to disclose all finance charges, including points, to the borrower.
First Family's escrow/closing agent, at its direction, prepared a Federal Truth-in-Lending "Finance Itemization." It disclosed that a "prepaid finance charge" amounting to five percent of the amount financed had been paid to the mortgage broker as a broker's fee. It did not list as an additional mortgage broker's fee the 75% of the spread that was also paid to the broker. There is no question that such payments are part of the total finance charges borne by the borrower under the Mini-Code and, as such, are required to be disclosed to the borrower under Alabama law. Centennial Associates, Ltd. v.Clark, 384 So.2d 616 (Ala. 1980).
Congress passed the Real Estate Settlement Procedures Act of 1974 (RESPA) 12 U.S.C. § 2601 et seq. This act admittedly does not apply to the transaction that is the basis of this litigation (because this loan was made not to purchase a home, but to complete a shell home). Nevertheless, RESPA and the regulations promulgated under RESPA are instructive with regard to material disclosures required of mortgage lenders and mortgage brokers or correspondent lenders under similar or identical facts. Regulation X,[4] promulgated by the Department of Housing and Urban Development, expressly requires that loan correspondents and loan brokers disclose their fees to borrowers. Disclosure requirements, referred to by HUD as "mortgage broker disclosures," apply to any transaction in which the loan either is closed in the wholesale lender's name or is originated under a "table funding" arrangement in which the wholesale lender provides the funds for the loan closing. If the loan closes in the broker's name, the disclosure must be made, whether the broker's fees are in the form of a yield spread premium (sometimes referred to as a "market gain") or a servicing release premium or other fee. RESPA Regulation X requires disclosure of all broker's fees, by whatever name, just as the Mini-Code requires disclosure of all finance charges, by whatever name.
Rule 56, A.R.Civ.P., sets forth a two-tiered standard for determining whether to enter a summary judgment. In order to enter a summary judgment, the trial court must determine: 1) that there is no genuine issue of material fact and 2) that the moving party is entitled to a judgment as a matter of law. In determining whether a summary judgment was properly entered, the reviewing court must view the evidence in a light most favorable to the nonmovant. See Turner v. Systems Fuel, Inc.,475 So.2d 539, 541 (Ala. 1985); Ryan v. Charles Townsend Ford,Inc., 409 So.2d 784 (Ala. 1981). Rule 56 is read in conjunction with the "substantial evidence rule" (§ 12-21-12, Code 1975), for actions filed after June 11, 1987. See Bass v. SouthTrustBank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). In order to defeat a properly supported motion for summary judgment, the plaintiff must present "substantial evidence," i.e., "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v.Founders Life Assurance Co. of Florida, 547 So.2d 870, 871
(Ala. 1989).
The summary judgments were improper because questions of fact exist with respect to the relationships between EquiSouth and borrowers, EquiSouth and First Family, and First Family and borrowers. The factfinder could 1) conclude that First Family and EquiSouth had a duty to disclose overcharge on points; 2) conclude that the relationship between First Family and EquiSouth was a sham; 3) conclude that in reality EquiSouth was merely acting on behalf of First Family; 4) conclude that the relationship was entered into to deceive such borrowers as these plaintiffs; and 5) conclude *Page 1273 
that the relationship was entered for legitimate purposes as well.
The plaintiffs do not contend that the correspondent lending program embarked upon by First Family and EquiSouth is in any way illegal. The plaintiffs do contend, however, that Alabama law requires both EquiSouth and First Family to disclose to borrowers all material facts relating to the transaction. They contend that the defendants deliberately concealed from them the true nature of the relationship between EquiSouth and First Family for the purpose of concealing from them the true cost of the loan, and that they conspired to withhold from the plaintiffs the material fact that the origination fees charged to the plaintiffs exceeded the amount permitted by the newly amended Mini-Code. Therefore, the plaintiffs contend that the trial court erred in entering the summary judgments for the defendants. The plaintiffs insist that there is sufficient evidence from which a jury could conclude that, notwithstanding its arrangement with EquiSouth, First Family was in fact the primary lender in this transaction, and that the arrangement with EquiSouth, while on its face not illicit, became so when entered into for the purpose of charging borrowers, such as the plaintiffs, origination fees in excess of the five percent allowed by the controlling statute. The plaintiffs produced substantial evidence to support these contentions and thereby created a genuine issue of material fact requiring resolution by a jury.
We note, however, that there is nothing wrong with mortgage lenders' doing business through mortgage brokers or correspondent lenders. In fact, that practice has become commonplace and should be encouraged. It makes credit available to more Americans from more sources, and it is a more economical way for mortgage lenders to do business. It not only allows them to operate with less overhead, but also allows them to lend with greater geographical diversity. But if these borrowers can prove to the satisfaction of the jury, as they have alleged, that this arrangement between First Family and EquiSouth was entered into for the purpose of collecting from borrowers more money in the form of origination fees (points) by concealing from them the full amount of finance charges incurred, they are entitled to recover.
Because there are genuine issues of material fact from the resolution of which a jury could conclude that the plaintiffs' contentions are true, the summary judgments are reversed and the cause is remanded for a trial on the merits.
REVERSED AND REMANDED.
ALMON, ADAMS, STEAGALL, KENNEDY and INGRAM, JJ., concur.
[1] On November 7, 1991, EquiSouth filed a "suggestion of bankruptcy" and was severed from the case on February 10, 1992.
[2] On May 8, 1992, Cambridge Title was dismissed pursuant to a joint stipulation with the plaintiffs, and it is not a party to this appeal.
[3] First Family did not seek a summary judgment as to the plaintiffs' claims based on alleged harassment stemming from First Family's attempt to have the plaintiffs make payment, because the harassment claim was settled.
[4] 24 C.F.R. Part 3500.