**Jeff C. BRIGGS, et al., Plaintiffs,**

v.

**COUNTRYWIDE FUNDING CORP., et al., Defendants.**

Civil Action No. 95-D-859-N.

United States District Court,
M.D. Alabama,
Northern Division.

March 8, 1996.

C. Knox McLaney, III, Angela L. Kimbrough, McLaney & Associates, Montgomery, AL, Lynn W. Jinks, III, L. Bernard Smithart, Jinks, Smithart, Jackson & Daniel, L.L.C., Union Springs, AL, for plaintiffs Jeff C. Briggs, and Kathy Briggs, on behalf of themselves and all others similarly situated.

John H. Morrow, Richard H. Monk, III, Matthew H. Lembke, Bradley, Arant, Rose & White, Birmingham, AL, John C. Englander, Thomas M. Hefferon, Goodwin, Procter & Hoar, Boston, MA, for defendant Countrywide Funding Corporation.

Randall B. Perry, House, Perry & Kavanaugh, Huntsville, AL, for defendant Madison Equity Mortgage Co., Inc.

*MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

Before the court is the defendant Countrywide Funding Corporation's (hereafter "Countrywide") motion filed August 21, 1995, to dismiss Counts II, III, IV and V of the complaint. The plaintiff responded in opposition on September 6, 1995. Thereafter, on September 26, 1995, Countrywide replied to the plaintiff's response. After careful consideration of the relevant case law, the arguments of counsel, and the record as a whole, the court finds that Countrywide's motion is due to be denied.

### STANDARD OF REVIEW FOR MOTION TO DISMISS

 Pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure,* a defendant may move to dismiss a complaint on the ground that the plaintiff has failed to state a claim upon which relief may be granted. A Rule 12(b)(6) motion questions the legal sufficiency of a complaint; therefore, in assessing the merit of a Rule 12(b)(6) motion, the court must assume that all the factual allegations set forth in the complaint are true. *See, e.g., United States v. Gaubert,* 499 U.S. 315, 327, 111 S.Ct. 1267, 1276, 113 L.Ed.2d 335 (1991); *Powell v. Lennon,* 914 F.2d 1459, 1463 (11th Cir.1990). Moreover, all factual allegations are to be construed in the light most favorable to the plaintiff. *See, e.g., Sofarelli v. Pinellas County,* 931 F.2d 718, 721 (11th Cir.1991); *see also Brower v. County of Inyo,* 489 U.S. 593, 598, 109 S.Ct. 1378, 1382, 103 L.Ed.2d 628 (1989).

 On a motion to dismiss for failure to state a claim upon which relief may be granted, the movant "sustains a very high burden."[1] *Jackam v. Hospital Corp. of America Mideast, Ltd.,* 800 F.2d 1577, 1579 (11th Cir.1986) (citing *Currie v. Cayman Resources Corp.,* 595 F.Supp. 1364, 1376 (N.D.Ga.1984)). The Court of Appeals for the Eleventh Circuit has held, "motions to dismiss for failure to state a claim should be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims." *Jackam,* 800 F.2d at 1579 (quoting *Bracewell v. Nicholson Air Servs., Inc.,* 680 F.2d 103, 104 (11th Cir. 1982)); *see also Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984).

### PROCEDURAL FACTS AND HISTORY

This case is about a mortgage loan which plaintiffs Jeff and Kathy Briggs obtained from defendant Madison Equity Mortgage Company, Inc. (hereafter "Madison Equity"), a mortgage broker. Madison Equity lent the funds which the Briggs used to refinance their residence. Pl.s' Compl. at ¶¶ 6, 7 & 13. Essentially, the Briggs allege that they were defrauded and sustained other legal injuries because Countrywide paid Madison Equity a fee of $528.75 when Madison Equity subsequently assigned their loan to Countrywide. *Id.* at ¶¶ 7, 14 & exh. A.

The Briggs challenge this payment from Countrywide to Madison Equity. Specifically, they allege that Madison Equity received the money, referred to as a "yield spread premium," only because Madison Equity had arranged for an "above market" interest rate loan, contrary to Madison Equity's alleged agreement with the Briggs to obtain a loan with the "best" interest rate. *Id.* at ¶ 15(c). The Briggs further contend that Countrywide's offer of a yield spread premium improperly induced Madison Equity to arrange for a loan on less favorable terms than the Briggs otherwise could have received. *Id.* at ¶¶ 27 & 28. The Briggs also seek certification of this case as a class action, primarily for the purpose of adjudicating the legality of Countrywide's alleged similar relationships with each of its mortgage brokers. *Id.* at ¶¶ 4 & 32–41.

As a result of the foregoing, the Briggs claim that Madison Equity and Countrywide took advantage of them because their loan allegedly is at an inflated, above-market interest rate. The complaint alleges that the yield spread premium arrangement was fraudulently concealed (Count III), induced Madison Equity to abandon its agreement to find the Briggs the best rate loan (Counts IV

---

**1.** Rule 12(b)(6) of the *Federal Rules of Civil Procedure* permits a party to plead or move for dismissal of a complaint if that complaint fails to state a claim upon which relief may be granted.

and V) and was part of a racketeering conspiracy by Countrywide to commit mail and wire fraud of borrowers such as the Briggs (Count II, under the Racketeer Influenced and Corrupt Organizations Act (hereafter "RICO"), 18 U.S.C. § 1961 *et seq.*). The Briggs also bring a claim under the Real Estate Settlement Practices Act (hereafter "RESPA"), 12 U.S.C. §§ 2601 *et seq.* (Count I) and a claim for fraudulent misrepresentation (Count VI). Countrywide moves to dismiss Counts II, III, IV and V of the plaintiff's complaint.

## DISCUSSION

Countrywide first asserts that the Briggs' three state law claims[2] against them are barred by statute. Specifically, Countrywide contends that each of these claims should be dismissed because, under § 5–19–6(c) of the *Code of Alabama*, the arrangements between Countrywide and Madison Equity did not have to be disclosed. Furthermore, Countrywide contends that by definition, the payment itself was not improper.

### A. *Obligation to Reveal Agreements to Pay a Yield Spread Premium*

■ Article 19 of Title 5 of the *Code of Alabama* provides for comprehensive State regulation of loans such as the one the Briggs obtained from Madison Equity by providing guidance on required disclosures and collectable charges. Ala.Code § 5–19–1 *et seq.* (1994). This so-called "Mini–Code" also contains licensing requirements for brokers (§ 5–19–22), limitations on the amount of certain fees which can be collected (§§ 5–19–3 & 5–19–4) and provisions for injunction, penalties and administrative enforcement (§§ 5–19–21, 5–19–29 & 5–19–30). The statute supplements federal laws, such as RESPA and the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.*, which are applicable to similar transactions.

2. The Briggs allege in Count III that Countrywide fraudulently concealed the fact that it offered to pay Madison Equity a yield spread premium if the Briggs' loan was closed at an interest rate above a certain "par" rate. The Briggs further allege in Count IV that the payment was an improper interference with the brokerage contract between them and Madison Equity. Finally, the Briggs contend in Count V

In 1993, the Supreme Court of Alabama decided *Smith v. First Family Financial Services, Inc.*, which had similar facts to the present case. 626 So.2d 1266 (Ala.1993). In *Smith*, the broker lent mortgage funds, under a "table funding" relationship of the type which Countrywide and Madison Equity are alleged to have had here. Furthermore, as is alleged here, the broker received a yield spread premium from the table-funding financial institution. Unlike the Briggs' loan, however, the yield spread premium payment in *Smith* was not disclosed. The plaintiff in *Smith* asserted, among other claims, that the Mini–Code required disclosure of all yield spread premiums to be paid and that the broker and lender had improperly failed to disclose "the true nature of the relationship between [them] for the purpose of concealing from [the borrower] the true cost of the loan." *Id.* at 1273.

The Court in *Smith* found that the Mini–Code required disclosure of the yield spread premium because the statute prohibited charging more than five points in any transaction. *Id.* at 1272 (citing Ala.Code § 5–19–14(g)). The Court also permitted the borrower to proceed to trial on other legal theories, including the claim that the failure of the broker to disclose its relationship with the table-funding financial institution could be a basis for an award of damages for fraud and breach of fiduciary duty. *Id.* at 1272–73.

Reacting to the *Smith* decision, the Alabama Legislature enacted § 5–19–6 in response to the "uncertainty" under Alabama law concerning "whether the Mini–Code requires a separate disclosure of finance charges such as 'yield spread premiums.'" 1994 Ala. Acts 115, § 1(6) (eff. Feb. 24, 1994). The Legislature left intact the *Smith* court's holding that, due to the statutory limitation on points, a broker would be required to disclose "broker fees and points;"[3] however

that the offer of a yield spread premium induced Madison Equity to breach alleged fiduciary duties said to arise under the brokerage agreement Madison Equity had with the Briggs.

3. The statute preserves *Smith*'s holding that a broker must disclose the amount of the yield spread premium, providing that "[n]o disclosures are required ... other than ... [disclosures] of

it explicitly reversed the court's ruling that a suit could be maintained for failure to disclose the source, the nature or the reason for a yield spread premium payment. In this regard, the Legislature stated that:

> except for the provisions of [the statute] related to Section 5–19–4(g), there is no obligation or duty under this chapter to disclose to a debtor any agreement to assign or otherwise transfer a consumer credit transaction at a discount or that the assignee of, or the person who funded, the consumer credit transaction agreed or may agree to pay the creditor or other person who originated the consumer credit transaction all or a portion of the prepaid finance charges and other fees and/or a portion of the finance charge to be paid by the debtor over the term of the transaction and/or any other compensation irrespective of how the compensation is determined or described.

*Id.* at § 2 (codified at Ala.Code § 5–19–6(c)).

In the statutory preamble, the Legislature stated that it "finds and declares" that "[b]ecause of *Smith* ... uncertainty exists as to whether the Mini–Code requires a separate disclosure of finance charges such as 'yield spread premiums'.... This uncertainty has caused Alabama lenders to be unable to determine what disclosures are required by the Mini–Code ... [and] has adversely affected the ability of [lenders] to securitize or transfer many millions of dollars of [loans and] ... could result in a significant reduction in the amount of consumer credit available to Alabama residents." *Id.* at § 1(6). The preamble further recited the fact that federal laws and regulations establish a "comprehensive system" for lending disclosures, which the state Commissioner of Banks "has determined ... are adequate." *Id.* at § 1(5). The Legislature then stated the legislative intent, important here, that "[t]o avoid confusion to consumers and conflicts with federal law and to provide certainty with respect to required disclosures, it is essential that any disclosures required by the Mini–Code in addition to those required by federal law be carefully considered, specifically stated, and prospective in application." *Id.*

Countrywide contends that the Briggs' fraud claim is inconsistent with the statute, and must be dismissed. Furthermore, Countrywide asserts that the Mini–Code amendment is fatal to the Briggs' assertion that the payment of the yield spread premium either intentionally interfered with the Briggs' contract with Madison Equity (Count IV) or induced Madison Equity to breach any duties to the Briggs (Count V). However, the Briggs respond that Ala.Code § 5–19–6(c) is preempted by federal law, and it violates the Alabama constitution as it reflects the Legislature's attempt to invade the exclusive domain of the judiciary.

The Briggs contend that the defendants must satisfy the requirements of federal law rather than those imposed by the Alabama Mini–Code. Pl.s' Resp. at 3. In support thereof, the Briggs point out the Legislature's intent that "it is essential that any disclosures required by the Mini–Code *in addition* to those required by federal law be carefully considered...." *Id.* (quoting 1994 Ala. Acts 115, § 1(5) (eff. Feb. 24, 1994) (emphasis added). The Briggs further cite 12 U.S.C. § 2616, which preempts state laws regarding settlement practices to the extent that they are inconsistent with RESPA, unless they provide greater protection for the consumer.[4]

■ RESPA requires the disclosure of a yield spread premium in the 800 series of numbers on a HUD–1 settlement statement. 24 C.F.R. § 3500.14, appendix B ("Any other fee or payment received by the mortgage broker from either the lender or the borrower arising from the initial funding transac-

---

real estate mortgage broker fees and points as has been or may be described by judicial decision pursuant to [§] 5–19–4(g)...." Ala.Code § 5–19–6(b). The effect of this section of the statute is not at issue, because the Briggs admit that they were told of the amount of the yield spread premium. *See* Pl.'s Compl. at ¶ 14 & Ex. A.

4. 12 U.S.C. § 2616 provides:

This chapter does not annul, alter, or affect, or exempt any person subject to the provisions of this chapter from complying with, the laws of any State with respect to settlement practices, except to the extent that those laws are inconsistent with any provision of this chapter, and then only to the extent of the inconsistency.

tion, including a servicing release premium or yield spread premium, is to be noted on the Good Faith Estimate and listed in the 800 series of the HUD–1 Settlement Statement."). Moreover, RESPA, in addition to disclosure provisions, contains anti-kickback provisions, which are substantive prohibitions of certain charges. *See* Pls.' Resp., Ex. A. In fact, the fees in question in this case could be considered illegal whether or not disclosed.[5]

The Briggs rely upon Regulation X, 24 C.F.R. § 3500.14, issued by the Department of Housing and Urban Development (hereafter "HUD") to implement RESPA. The Regulation X(b) and (c) are as follows:

(b) *No referral fees.* No person shall give and no person shall accept any fee, kickback, or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a settlement service involving a federally-related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in § 3500.14(g)(2). A company may not pay any other company or the employees of any other company for the referral of settlement service business.

(c) *No split of charges except for actual services performed.* No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally-related mortgage loan other than for services actually performed. A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section. The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this Part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

Furthermore, an entirely new section was added in the December 1992 amendments to Regulation X, which provides:

(4). *Multiple services.* When a person in a position to refer settlement service business, such as an ... mortgage lender ... receives payment for providing additional settlement services as part of a real estate transaction, such payment must be for services that are actual, necessary and distinct from the primary services provided by such person.

These foregoing sections of the Regulation implement both portions of 12 U.S.C. § 2607, which read as follows:

(a) *Business referrals.* No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(c) *Splitting Charges.* No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

▉▉▉ The court finds it noteworthy to mention that it may consider the HUD regulations in construing 12 U.S.C. § 2607 because Congress, in 12 U.S.C. § 2617(a), specifically authorized HUD to "prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary." Furthermore, the Supreme Court of the United States in *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1972), held that a regulation issued pursuant to broad statutory power, such as present in this case, will be "sustained so long as it is reasonably related to the purpose of the enabling legislation." *Id.* Attentiveness to the

---

5. The court stresses that, at this juncture, it construes the allegations and factual inferences arising therefrom in the light most favorable to the plaintiff. *Sofarelli v. Pinellas County,* 931 F.2d 718, 721 (11th Cir.1991); *see also Brower v. County of Inyo,* 489 U.S. 593, 598, 109 S.Ct. 1378, 1382, 103 L.Ed.2d 628 (1989).

views of the administrative entity appointed to apply and enforce a statute is required. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 796–97, 63 L.Ed.2d 22 (1980). Moreover, " 'if [a] statute is silent or ambiguous with respect to [a] specific issue, [a court must determine] … whether the agency's answer is based on a permissible construction of the statute.' " *Nationwide Mutual Ins. Co. v. Cisneros*, 52 F.3d 1351, 1356 (6th Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 973, 133 L.Ed.2d 893 1995 WL 668851 (Feb. 20, 1996) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). The court also recognizes that Congress created ambiguity in the statute by "banning an outcome while not saying who the actor is, or how such actors bring about the forbidden consequence." *Nationwide,* 52 F.3d at 1356 (quoting *N.A.A.C.P. v. American Family Mut. Ins. Co.,* 978 F.2d 287, 298 (7th Cir. 1992), *cert. denied,* 508 U.S. 907, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993)).

 Here, the statute does not describe the actions which would constitute a kickback or an unearned fee. As such, the court finds, in accordance with the above instructions from the Supreme Court, that it is not "demonstrably irrational" for HUD to deem fees for which no services are performed or which are duplicative to be "kickbacks" within the meaning of the statute. The court believes that HUD has properly promulgated Regulation X to further the purpose of the statute and to relieve some of the ambiguity in the statute. Therefore, the court will consider the HUD regulations in determining whether RESPA preempts application of Ala.Code § 5–19–6(c).

 The court finds that RESPA preempts § 5–19–6(c) to the extent that it does not require the disclosure of information about a yield spread premium by lenders to borrowers, such as the Briggs. Clearly, RESPA's disclosure requirements are inconsistent with § 5–19–6(c). Furthermore, § 5–19–6(c) provides lesser protection for the consumer than does RESPA. Thus, Countrywide may be compelled to disclose *all* details about any yield premiums, depending on its involvement in the transaction at issue. *See infra* pp. 13–18. The court also cautions that if the Briggs allegations are true, then the fees at issue in this case, could well be classified as kickbacks rendered illegal by RESPA.

Countrywide argues that if the Alabama statute is preempted because RESPA completely occupies "the arena of disclosure," both statutory and common law sources of state law are rendered ineffective. Thus, the Briggs' state law claims in Counts III, IV and V, which Countrywide contends seek to impose or have the effect of imposing disclosure requirements, are inconsistent with the scheme of RESPA, which Countrywide contends contains only a limited requirement with respect to disclosure of yield spread premiums.

 Countrywide offers the court no case law to substantiate these assertions; therefore, the court finds that Countrywide has failed to satisfy the extremely high burden placed on defendants moving to dismiss a complaint for failure to articulate a cause upon which the court may grant relief. Furthermore, the court stresses that RESPA doesn't encompass state law as to preempt all state causes of action. Essentially, the court preempts Alabama law which conflicts with RESPA, not the entire field. *See Boyle v. United Technologies Corp.,* 487 U.S. 500, 504, 108 S.Ct. 2510, 2514, 101 L.Ed.2d 442 (1988) ("[W]e have held that a few areas, involving 'uniquely federal interests,' … are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts—so-called 'federal common law.' " (internal citations omitted)). Therefore, the court finds that a summary disposal of plaintiff's fraud claim on the issue of preemption is unjustifiable.

 Countrywide also argues that Count III, which alleges fraud based upon a failure to disclose information about the yield spread premium, must be dismissed for the additional reason that it is stated only against Countrywide, and Countrywide is not alleged to

have had any dealings with the Briggs at which time it allegedly should have made the disclosures. In other words, Count III must be dismissed because there is no allegation that Countrywide even dealt with the Briggs.

In support thereof, Countrywide relies on *Bama Budweiser of Montgomery, Inc. v. Anheuser–Busch, Inc.*, 611 So.2d 238 (Ala.1992), for the proposition that a plaintiff cannot state a claim for bare non-disclosure if a plaintiff and a defendant had no dealings on the particular subject. On the other hand, the Briggs rely on *Duckworth v. National Bank of Commerce*, 656 So.2d 340 (Ala.1994), suggesting that Countrywide could be liable if it knew that Madison Equity was committing a fraud and failed to disclose this fact.

In *Bama Budweiser*, a potential franchisee of a beer distributorship sued the parent beer company and claimed, among other things, that the company had fraudulently concealed a market report pertinent to the value of the franchise at a time when the plaintiff was negotiating to purchase an existing distributorship from another franchisee. Similar to the case at bar, there was no allegation that the beer company was involved in the negotiations which allegedly would have turned out differently had the market report been revealed. On these facts, the Supreme Court of Alabama held that no claim could be made out against the uninvolved defendant, simply because the company "was in no way involved in the negotiation process." *Id.* at 246. As such, Countrywide contends that the Briggs' theory that it fraudulently concealed facts from them, where Countrywide and the Briggs are not alleged to have been in contact, is foreclosed by the *Bama Budweiser* decision.

Countrywide further contends that one commits fraud by silence only if there is a duty to speak. Ala.Code § 6–5–102; *Soniat v. Johnson–Rast & Hays*, 626 So.2d 1256, 1259 (Ala.1993). Furthermore, Alabama law strictly limits those circumstances where even parties to the relationship have a "duty to speak;" ordinarily, parties who deal at arms length have no obligation to disclose information not actually requested. *Bama Budweiser*, 611 So.2d at 246; Ala.Code § 6–5–102.

Countrywide also contends that a fiduciary or confidential relationship must be shown before a duty to disclose is triggered, although "special circumstances" can require disclosure in certain cases. *Id.; Cornelius v. Austin*, 542 So.2d 1220, 1223 (Ala.1989). Here, there is no claim that Countrywide owed the Briggs any fiduciary duties, or that Countrywide was anything more than the funding source for Madison Equity. Pl.s' Compl. at ¶ 11. This relationship does not create a fiduciary duty. *Gulf States Steel, Inc. v. Lipton*, 765 F.Supp. 696, 698 (N.D.Ala.1990), *aff'd*, 934 F.2d 1265 (11th Cir.1991) ("Alabama law clearly does not imply a fiduciary duty into debtor-creditor relationships."); *Bank of Red Bay v. King*, 482 So.2d 274, 285 (Ala.1985) (same); *Holdbrooks v. Central Bank of Alabama, N.A.*, 435 So.2d 1250 (Ala.1983) (fiduciary or confidential relationship arises when one acts in "position of advisor and counselor"). Therefore, Countrywide contends that it cannot be held liable for fraudulent concealment of the details of the yield spread premium payments.

On the other hand, the Briggs contend that it is well established that all persons who participate in or induce a breach of fiduciary duty are liable. Specifically, the Briggs point to the case of *Duckworth v. National Bank of Commerce*, 656 So.2d 340 (Ala.1994). In *Duckworth*, a real estate developer convinced the "Tuscaloosa Group" to advance him $175,000.00 for a real estate development project. The developer provided an option to purchase five lots in a subdivision as security on the note, but the "Tuscaloosa Group" demanded a consent from the bank who was the holder of a first mortgage on the property. The developer provided an agreement purportedly signed by a vice president of the bank, but which was, in fact, a forgery. Although the bank was made aware of the forgery almost immediately, it did nothing to inform the "Tuscaloosa Group." The Court found that the bank was under a legal duty to refrain from knowingly aiding the real estate developer, with whom it had no clear agency relationship, in committing fraud. *Id.* at 343. Similarly, the Briggs contend neither is Countrywide "free to sit idly by" and collect the profits of Madison Equity and

other mortgage brokers' fraud when it knows that such fraud is being perpetrated, due to their involvement in the transaction, virtually from the beginning. In the case of allowing a broker to collect a yield spread premium, Countrywide is actually participating in and benefitting from this scheme to defraud.

■ The court finds that, in construing all inferences in favor of the Briggs, Countrywide is too close to the fraud to escape liability in Alabama. The Supreme Court of Alabama has permitted an award against a lender found to have engaged in a pattern and practice of fraud in funding loans arranged by a home improvement contractor. *Union Mortgage v. Barlow,* 595 So.2d 1335 (Ala.), *cert. denied,* 506 U.S. 906, 113 S.Ct. 301, 121 L.Ed.2d 224 (1992). In *Union Mortgage,* the lender at one point is described as being not only a primary lender, but also primarily involved in the fraud. *Id.* at 1340–41. At another point, the Court appears to uphold analysis of the trial court based on almost exclusively on a derivative or agency theory. *Id.* at 1345. Hence, the court interprets *Union Mortgage* as holding that a lender may be liable when it is too close to the fraud (primarily liable) or the lender controlled the actions of the contractor engaged in fraud and is thus derivatively liable (under an agency theory) for the ac-

tions of the agent. However, the court cautions that it narrowly interprets *Union Mortgage* on its specific facts.[6] Therefore, it may well be the case that the Briggs cannot offer sufficient evidence to ultimately prevail at trial or defeat a motion for summary judgment; however, those stages have higher burdens of persuasion and/or production. The court is not to even consider evidence at this stage because discovery often uncovers facts and evidence not available when an action is initially filed.

Here, the Briggs are attempting to show that Countrywide was very much involved in condoning, if not participating in, the fraudulent scheme. After discovery, there may be enough bad facts for Countrywide to be cast as primarily involved in the fraud. As a result of the foregoing, it would be premature for the court to dismiss Count III until discovery unfolds the extent of Countrywide's involvement in the transactions between Madison Equity and the Briggs.

### B. *Counts IV and V*

■ Countrywide also moves the court to dismiss Counts IV and V because it cannot be improper to pay a yield spread premium where the legislature has expressly stated that the details of the payment need not be disclosed. Specifically, Countrywide contends that the aforementioned Mini–Code

---

**6.** In fact, as evident from the below summarization, the court believes that the facts in *Union Mortgage* reveal that Union Mortgage not only had knowledge of the dealer's dishonest practices, but Union Mortgage was essentially in control:

> [E]vidence at the trial was offered to show that American Home and Union Mortgage had worked together in similar transactions across the state, resulting in consumers having a mortgage on their homes for inflated repair prices and direct cash payments to borrowers. In several of those earlier transactions, as in this case, the borrowers were in default with other mortgage creditors when the Union Mortgage loan was made. According to the Alabama Supreme Court, "in one of its first transactions with American Home, Union Mortgage had clear information that American Home had not left any documents with the mortgagor, that the improvements were not worth the amount of the loan, and that the mortgagor expected to receive cash proceeds from the loan." The court went on to note: "These facts supports [sic] the plaintiffs' theory that Union Mortgage directly participated in

the fraud, of only because it took no direct action of its own to effectively prevent what it now claims to have been a violation of its [own] practices."

Gene A. Marsh, *Lender Liability for Consumer Fraud Practices of Retail Dealers and Home Improvement Contractors,* 45 Ala.L.Rev. 21–22 (1993) (internal footnotes omitted). The facts in *Union Mortgage* also reveal "a contractor who could not function without Union Mortgage and a lender whose decision to fund a loan controlled the nature of the contractor's business. The contractor in Union Mortgage evidently used Union Mortgage exclusively and did no work other than in cases where Union Mortgage funded the loan." *Id.* at 34 (footnote omitted). Hence, "*Union Mortgage* presented facts showing a contractor engaged in fraud and a lender portrayed as being very much involved in condoning, if not participating in, the fraudulent scheme." *Id.* at 34–35. The court reads *Union Mortgage* as a fraud case with enough "bad" facts for the lender to be cast as primarily involved in the fraud. Thus, whether the instant case contains enough "bad" facts is an issue to be resolved at a later stage.

amendment is fatal to the Briggs' assertion that the payment of the yield spread premium either intentionally interfered with the Briggs' contract with Madison Equity (Count IV) or induced Madison Equity to breach any duties to the Briggs (Count V). However, as discussed *supra*, the court cannot determine whether there was a disclosure requirement until discovery unfolds the extent of Countrywide's involvement in the transactions between Madison Equity and the Briggs. Accordingly, it would be premature for the court to dismiss Counts IV and V.

## C. *RICO Count*

■ The Briggs allege in Count II that Countrywide "engaged in a scheme or artifice to defraud" its borrowers by inducing "mortgage brokers to steer them [prospective borrowers] to Countrywide for loans with inflated interest rates in exchange for hidden commission payments." Pl.'s Compl. at ¶ 46, 55. The plaintiffs allege that such a scheme constitutes a violation of § 1962(c) of RICO.[7] The participants of this purported scheme include the following "enterprises:" Countrywide and Madison Equity; Countrywide and each mortgage broker individually; Countrywide and all mortgage brokers collectively; and Countrywide Credit Industries, Inc., parent of Countrywide. *Id.* at ¶ 46.

■ The court recognizes that it is well established that a plaintiff claiming a RICO violation must show that the alleged enterprise has an existence distinct from the alleged pattern of racketeering activity. *Downing v. Halliburton & Assocs., Inc.,* 812 F.Supp. 1175, 1179 (M.D.Ala.1993), *aff'd,* 13 F.3d 410 (11th Cir.1994). A RICO enterprise is "not the pattern of racketeering activity, it is an entity separate and apart from the pattern or activity in which it engages." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2525, 69 L.Ed.2d 246 (1981); *see also United States v. Cagnina,* 697 F.2d 915, 920 (11th Cir.), *cert. denied,* 464 U.S.

856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983); *Frank v. D'Ambrosi,* 4 F.3d 1378, 1386 (6th Cir.1993); *Landry v. Air Line Pilots Ass'n Int'l AFL–CIO,* 901 F.2d 404, 433 (5th Cir.), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990). The Briggs must allege an "agreement of an overall objective" on behalf of the alleged enterprise's participants, not just that predicate acts were committed. *United States v. Valera,* 845 F.2d 923, 929 (11th Cir.1988), *cert. denied* 490 U.S. 1046, 109 S.Ct. 1953, 104 L.Ed.2d 422 (1989). In other words, a RICO claim must be supported by a separate agreement between the participants. *Id.*

Here, viewing the factual allegations in the light most favorable to the Briggs, the court finds the court finds that the Briggs have sufficiently pled their RICO allegations. In making this determination, the court has carefully considered the RICO arguments presented by both sides. At this juncture, the court cannot assess the validity of the pleadings or evidence; therefore, the court finds that a summary disposal of plaintiff's RICO claims is unjustifiable. It may well be the case that the Briggs cannot offer sufficient evidence to ultimately prevail at trial or defeat a motion for summary judgment; however, as stated earlier, those stages have higher burdens of persuasion and/or production. The court reiterates that it is not to even consider evidence at this stage because discovery often uncovers facts and evidence unavailable when an action is initially filed.

## CONCLUSION

Based on the foregoing, it is CONSIDERED and ORDERED that defendant Countrywide Funding Corporation's motion to dismiss be and the same is hereby DENIED.

---

7. Section 1962(c) states that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or a collection or unlawful debt." 18 U.S.C. § 1962(c).