REL: 09/26/2014

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2014

_____

### 1130378

_____

### Jean S. Gray

v.

### Larry O. Bain and Sharon Johnston

### Appeal from Elmore Circuit Court
### (CV-99-0238)

MURDOCK, Justice.

Jean S. Gray appeals from two orders of the Elmore Circuit Court in an action filed against Larry O. Bain and Sharon Johnston in which Gray sought a judgment declaring that she owned a parcel of land (hereinafter "the parcel") and an

1130378

injunction preventing Bain and Johnston from asserting any rights to the parcel. We conclude that the trial court erred in granting a Rule 60(b), Ala. R. Civ. P., motion filed by Bain and Johnston that set aside a settlement of the action.

## I.  Facts and Procedural History

This action has been appealed twice before. In <u>Bain v. Gray</u>, 835 So. 2d 1034 (Ala. Civ. App. 2002) ("<u>Bain I</u>"), the Court of Civil Appeals summarized the pertinent underlying facts of the dispute between the parties.

> "The .05-acre parcel in dispute is located in the Kowaliga Bay Estates subdivision in Elmore County. The record indicates that the parcel is a rocky, narrow strip of land that slopes steeply down on its west side into a slough on Lake Martin. The parcel is bordered to the east by Big Oak Drive, to the north by Cove Drive, and to the south by Poplar Drive.

> "The record contains a copy of the original subdivision plat filed in September 1953. The subdivision plat divides the property composing the subdivision into units, then into blocks, and then into lots. From our review of the record, it appears that all of the smallest divisions of the property in the subdivision plat are designated by lot numbers, with the exception of the disputed parcel. However, on the subdivision plat, three lines are drawn across the parcel. The record indicates that those lines, if continued across Big Oak Drive, match the lines dividing Lots 2, 3, and 4, of Block No. 5, Unit No. 2, of the Kowaliga Bay Estates subdivision.

2

"Gray owns Lots 2, 3, and 4, of Block No. 5, Unit No. 2, of the Kowaliga Bay Estates subdivision, the lots directly across Big Oak Drive from the parcel. [Bain and Johnston] own Lot 13 and Lot 14 of Block 8, Unit 2, of the Kowaliga Bay Estates subdivision. One of [Bain and Johnston's] lots is directly across the slough from the parcel. The parties' deeds describe their respective properties by lot, block, and unit numbers; all of the deeds preceding those deeds date back to the time the subdivision plat was recorded, and describe the properties by lot, block, and unit numbers. None of the deeds to the parties' properties contain a metes-and-bounds description, and none of the deeds reference or describe the parcel."

835 So. 2d at 1035-36.

On June 9, 1999, Gray and her husband Burl A. Gray filed this action asking seeking declaratory and injunctive relief concerning ownership of the parcel.[1] Bain and Johnston answered and filed a counterclaim also seeking declaratory and injunctive relief concerning ownership of the parcel.

"On September 28, 2000, [Bain and Johnston] filed a motion for a summary judgment. On December 22, 2000, Jean Gray filed a motion for a summary judgment and a brief in support of that motion. The trial court held a hearing on both parties' summary-judgment motions. On May 4, 2001, the trial court denied the parties' summary-judgment motions and issued an order dividing the parcel between the parties. [Bain and Johnston] filed a motion to alter, amend, or vacate the trial court's

---

[1]Burl Gray died on August 27, 1999. Jean Gray moved to have him dismissed as a party, and the trial court granted that motion.

1130378

> May 4, 2001, order; that motion was denied by operation of law. [Bain and Johnston] appealed to the Supreme Court of Alabama; Gray cross-appealed. The Supreme Court of Alabama transferred the appeals to [the Court of Civil Appeals] pursuant to § 12-2-7(6), Ala. Code 1975."

835 So. 2d at 1035.

In Bain I, the Court of Civil Appeals explained that the trial court had divided the parcel between the parties after concluding that the original intent of the subdivision developers was ambiguous. The Court of Civil Appeals concluded that the trial court had erred in dividing the parcel at the summary-judgment stage, because, it held, "if the trial court determines that the deed is ambiguous, the intent of the grantor becomes a factual issue," and "[w]hen a genuine issue of material fact exists regarding the intent of the grantor in the deed, a summary judgment is not appropriate." 835 So. 2d at 1038. The Court of Civil Appeals also noted that "the trial court erred in dividing the parcel in a manner inconsistent with the parties' assertions and unsupported by the evidence presented by the parties at the hearing on the parties' summary-judgment motions." Id. Accordingly, the Court of Civil Appeals reversed the trial

4

1130378

court's judgment and remanded the cause for further proceedings.

For reasons not fully explained by the parties, nothing further occurred in this action for several years.[2] On August 19, 2011, following the retirement of presiding Judge John Rochester, this case was assigned to Judge Sibley Reynolds. Following several continuances, the trial court set the case for a May 30, 2012, trial date.

On May 30, 2012, with all parties present, a settlement agreement was reached during a recess in the proceedings. The terms of the settlement were read into the record by Gray's attorney. As the terms were read, the parties and their attorneys interjected to seek clarification on certain points. One such interjection was made by Bain and Johnston's counsel, who stated:

> "MR. HAYNES: Judge, on the very first paragraph. Bob, you said this earlier but did not recite it then. I believe it's an oversight or I didn't hear it. We believe that the waterfront that Ms. Gray would get would be more or less approximately eighty-seven feet, but that specific number is not controlling. It is the points that he referred to going through the delta points.

---

[2]The parties do indicate that attempts to settle the dispute were made during this period.

5

1130378

"THE COURT:  That will be established by the Speaks survey.

"MR. HAYNES:  Correct.

"MR. RENEAU [Gray's counsel]:  He's right.  That's in my notes and I neglected to say it."

(Emphasis added.)  After several such exchanges between the parties, their attorneys, and the trial court, the trial court asked Bain and Johnston's attorney:

"Do we have an agreement?

MR. HAYNES:  Yes, sir.

"THE COURT:  Ms. Gray, is that your understanding of the agreement?

"MS. GRAY:  I wish you could see the pictures of what is built over there.

"THE COURT:  Ms. Gray, if I start taking testimony, I'm not going to look. Is that your  understanding of the agreement?

"MS. GRAY:  Yes.

"THE COURT:  Is that your agreement?

"MS, GRAY:  Yes.

"THE COURT:  Mr. Bain, is that your understanding of the agreement?

"MR. BAIN:  Yes, sir.

"THE COURT:  Is that your agreement?

6

1130378

MR. BAIN: The only problem I have is when we agreed in the back room to what their first offer was about the property lines going across from three and going down to, what was that point, delta point four, we agreed to that. We didn't really agree to come over a foot and out a foot and do that. We agreed to what they offered. You know, we have been trying to settle this for a long, long time, thirteen years. You know, just to have to change it after we walk out here, we're not really happy.

"THE COURT: Mr. Bain, we're five minutes from that. That's what I was asking. Is that your understanding of the agreement?

"MR. BAIN: Yes, sir.

"THE COURT: Is that your agreement?

"MR. BAIN: Yes, sir.

"THE COURT: Ms. Johnston, is that your understanding of the agreement?

"MS. JOHNSTON: Yes, sir.

"THE COURT: Is that your agreement?

"MS. JOHNSTON: Uh-huh (positive response).

"THE COURT: Thank you, I will enter that order just as soon as it's presented. ..."

On June 12, 2012, the trial court entered an order based on the terms of the settlement. In pertinent part, the order provided:

"1. The parties will divide absolute ownership of the disputed property with the Plaintiff, Jean S. Gray (hereinafter referred to as 'Gray') receiving

7

the northern portion of the disputed property (which has been labeled as Parcel 57 by the Elmore County Revenue Commissioner's Office) and the Defendants, Larry O. Bain and Sharon Johnston (hereinafter referred to as 'Bain and Johnston') receiving the southern portion of same. [Bain and Johnston's] surveyor, Stephen Speaks, shall at [Bain and Johnston's] expense, prepare a boundary survey of the parcels to be received by the respective parties. Said survey shall be in accordance with a survey previously prepared by Speaks with the addition of the boundary line which will now divide the property into the two parcels to be received by the respective parties. The common boundary line shall begin on the west side of Big Oak Drive at the point which would represent the boundary line between Lot 3 and Lot 4, Block 5, Unit 2 of Kowaliga Bay Estates. Beginning at said point, the boundary line shall proceed to a point which is one foot from the point designated as the Delta Point between L-4 and L-5 on the previous Speaks survey. Said point shall be determined in a manner which will cause the remainder of the boundary line which intersects said Delta Point to be perpendicular to Big Oak Drive. The express purpose of the above is to cause the property line to enter Lake Martin at an angle perpendicular to Big Oak Drive.

"2. Upon completion of the new Speaks survey set forth in the proceeding paragraph, the parties shall exchange Quitclaim Deeds wherein each party relinquishes any and all claim of interest in the property to be received by the opposing party. Each party, at its own expense, shall record their Quitclaim Deed in the Office of the Judge of Probate of Elmore County, Alabama, within seven days of the receipt of same, and immediately thereafter shall deliver a recorded copy of said Quitclaim Deed to the Elmore Revenue Commissioner's Office so that the property may be appropriately assessed for ad valorem tax purposes in the future.

8

1130378

"3. The Court hereby orders the Elmore Revenue Commissioner's Office to terminate, beginning with the next ad valorem tax year, its assessment of the disputed property as Parcel 57 (which the parties currently have double assessed), and immediately thereafter to begin assessing the property to the respective parties in accordance with the descriptions set for in said Quitclaim Deeds referenced above.

"4. Bain and Johnston will not oppose, publicly or privately, any attempt by Gray to vacate Cove Drive west of its intersection with Big Oak Drive (the same lying between Lots 1 and 2, Block 5, Unit 2 of Kowaliga Bay Estates).

"5. Bain and Johnston will not oppose Gray's efforts to obtain the appropriate license or permit from Alabama Power Company to build a dock or a pier, including a ramp or stairway to said dock/pier abutting the property described in her Quitclaim Deed, nor will they oppose the construction of same. Likewise, Gray will not oppose the licensing/permitting or construction of a pier/dock by Bain and Johnston abutting the property described in their Quitclaim Deed. Any pier/dock to be constructed by either party must be done in accordance with the applicable regulations of Alabama Power Company.

"6. Bain and Johnston shall have the right, but not the obligation, to maintain the seawall which they previously built on property described in Gray's Quitclaim Deed. Bain and Johnston, however, shall not have the right to change or increase the height of said seawall without first obtaining written permission from Gray to do so.

"7. Neither party may construct any structure or improvements on the property described in their respective Quitclaim Deeds, other than as set forth

9

1130378

above, without first obtaining the written consent
of the other party.

"8. Neither party shall in any way intentionally
harass or annoy the other party or create a nuisance
on the property described in their respective Quit-
claim Deeds.

"9. The terms of this Order shall be appurtenant to
and shall run with the land so as to be binding on
the successors, assignees or heirs of the respective
parties.

"10. A separate Order to Revenue Commissioner will
be signed by the Court concurrently herewith. Said
order to Revenue Commissioner shall be delivered to
the Revenue Commissioner's Office and further, a
copy of same shall be recorded in the records
maintained in the Elmore Probate Office so as to
provide appropriate notice of the terms of same."

(Emphasis added.) As the settlement agreement provided, the

trial court also executed on June 12, 2012, an order directed

to the Elmore Revenue Commissioner's office, ordering that

office to begin assessing the parcel in accordance with the

quitclaim deeds it would receive describing the two segments

of the parcel.

According to Bain and Johnston, after the survey work

began on the parcel, it became clear to them that the boundary

line described in the settlement agreement was not the

boundary line they thought they were agreeing to. Bain and

Johnston "believed that the boundary line between Lots 4 and

10

1130378

started at the end of the seawall they built on the Big Oak side of the slough. Instead, the point was closer to the creek end of the slough then they had anticipated."

On July 24, 2012, Bain and Johnston filed a "Motion for Relief from Judgment" pursuant to Rule 60(b), Ala. R. Civ. P. In pertinent part, the motion asserted:

"[A] mistake was made when [Bain and Johnston] 'agreed' to a settlement prior to the commencement of the trial. [Bain and Johnston] telephoned Jim Bain, an employee of their business who is also the brother of Larry Bain, and asked him to go and determine where the property boundary line would be if they proposed settlement were accepted. Unfortunately, Jim Bain mistakenly 'located' the boundary line and called back explaining where he thought the line would be situated between [Gray] and [Bain and Johnston]. Jim Bain's understanding was erroneous and his description of where the line would be was off by several feet such that [Bain and Johnston] would never have agreed to the proposed settlement. [Bain and Johnston's] understanding of the settlement at the time the settlement was made, based on what they were mistakenly informed by Jim Bain, was simply wrong."

On July 25, 2012, Gray filed a response in opposition to the "Motion for Relief from Judgment." In her response, Gray noted that the settlement had occurred "[a]fter more than three (3) hours of negotiation." Gray further observed that,

"[w]hile counsel were reading their agreement into the record in the presence of the Court, several disagreements arose, which ultimately were resolved

11

with input from the Court. The final agreement to the settlement read into the record was delayed over the lunch break at the request of [Bain and Johnston] so that they could have an employee plot the exact location of the boundary line to which the parties were agreeing."

Gray argued that relief under Rule 60(b) "is an extraordinary remedy that is not to be used for the purpose of relieving a party from the effects of a free and voluntary consent judgment."

On September 26, 2012, the trial court held a hearing on Bain and Johnston's Rule 60(b) motion. The trial court took testimony from witnesses as to whether Bain and Johnston were mistaken as to the actual boundary line dividing the parcel when they agreed to the settlement on May 30, 2012.

Jim Bain testified that on May 30, 2012, his brother Larry called him while Jim was at lunch and asked him to drive out to the parcel and to measure the distance from one point to another. Specifically,

"[Larry Bain] explained to me that he was concerned about where a certain distance would hit on the shoreline. He asked me to go to his house and across the waterway and measure from a boathouse building back in a, I guess that would be a, southerly direction and tell him where that distance hit. There is a big rock and a bench that was built out of stone that he wanted to know how far away

12

from that boathouse it was. And I give him that information."

Jim Bain explained that the distance from the boathouse to the "big rock" was 83 feet, or 85 feet to the center of the rock because it is "a wide rock." He testified that he related this information to his brother and that he also sent some pictures using his cellular telephone. Jim Bain stated that he simply measured the distance between two points that were given to him by Larry Bain in that telephone conversation.

Larry Bain next testified as to what he asked his brother Jim to measure.

> "A. I asked him to go to what we thought was the property line, which was next to their boathouse, where we built a seawall already and measure over eighty-three feet because those were numbers that were being given to us, you know, on some sort of split of the property. That's what he told us. The seawall --
>
> "Q. Just answer the question. What was your understanding as to the significance of the eighty-three feet as you negotiated the settlement of your case for this property?
>
> "A. Well, that's where he told us where that big rock was, so we felt like we could agree on some sort of division right in there."

Bain asserted that the reason it was important for the boundary line to be where he thought it was as opposed to what

13

was described in the settlement agreement was that the latter boundary line would allow Gray to build a pier that could block Bain and Johnston's access to the water for loading and unloading equipment in their business.

On cross-examination, Bain was asked who made the mistake at issue, and he responded: "I'm going to have to say it was my mistake, my total mistake because that is where I was assuming the property line was, was next to that boathouse." He was then asked about what he heard on the day the settlement agreement was read into the record.

> "Q. Now, when we were in court before Judge Reynolds and we read the common boundary line shall begin at the west side of Big Oak Drive at a point which will represent the boundary line between lot three and lot four of block five unit two of Kowaliga Bay Estates, you understood where that was, didn't you?
>
> "A. No, sir, I didn't understand where it was because I couldn't see it on a map. I mean, you know, I couldn't see it -- where it was in adjacent to the land. That is why we had somebody go out and try to give us an idea of where that position was.
>
> "Q. Well, you understood where it was on the survey we were looking at that day, didn't you?
>
> "A. Well, I'm not a surveyor, but I could see it on the survey. That never told me where it was on the property --

14

1130378

"Q. All right.

"A. -- as I was looking from my house, no, sir.

"Q. But you knew that that was the starting point of this boundary line that we were agreeing to?

"A. Yes. I believe that is what y'all were saying was the starting line.

"Q. Then we said beginning at this point the boundary line shall proceed to a point which is one foot from the point designated at the delta point between L-4 and L-5 on the previous Speaks survey. And you heard that, didn't you?

"A. I did hear that.

"Q. And you were able to look at the Speaks survey and see where that point was?

"A. I think you threw that out there after -- that little angle you put on there was not on the survey. That you changed the angle on, I don't think that was there.

"Q. But the delta point didn't change is what I'm saying?

"A. That's right.

"Q. You knew where that delta point was?

"A. I could see it on the survey, yes, sir.

"Q. So you knew that it was from that point between lot three and four on the west side of Big Oak Drive to that delta point?

"A. I knew it was somewhere in between there, yes, sir.

15

1130378

"Q. Then we said, said point shall be determined in a manner which will cause the remainder of the boundary line which intersects the delta point to be perpendicular to Big Oak Drive. I left out the part where I said it should be one foot from the delta point. So you knew that day that the line was going to be perpendicular to Big Oak Drive extending into the lake, didn't you?

"A. Yes, sir.

"Q. You didn't say anything to anybody that day about, wait a minute, I told my brother to measure eighty-three feet and it is not the same?

"A. No, because we felt like that would have been a fair split on the property where he told us the eighty-three feet was. We felt like we could live with that.

"Q. But you knew when the settlement was being read into the Court that day that there was no mention of eighty-three feet?

"A. Well, that was just what we were being told. It was going to be eighty-three -- seven feet dispute, but that is not even what that is on that survey.

"Q. Well, Mr. Bain, listen to me. That may have been what your lawyers told you, but that is not what was discussed in open court with Judge Reynolds for the agreement, was it?

"A. No, sir."

Sharon Johnston also testified as to where she believed they were agreeing that the boundary line would be located,

16

echoing Bain's understanding. On cross-examination, Johnston was asked if, at the time the settlement agreement was read into the record, she understood the location of the boundary line that was being described. She responded:

> "We're trying to imagine eighty-three feet and where it is in relation to the bench and the rock and that sort of thing because we know that property. So that is why we asked someone to go out there. So no, I didn't understand to the degree that you are saying. This was a map that was sitting by itself with no trees, no rocks, no seawall, nothing. So we could not visualize where this actually was going to be. ... So without seeing this actual survey, we could not make a rationale decision."

Gray's attorney further explored Johnston's understanding at the time the settlement agreement was made:

> "Q. ... You understood on May 30th when we were in here and when you made the agreement that the boundary line as it extended into the lake was going to be perpendicular to Big Oak Drive, didn't you?
>
> "A. Yes.
>
> "Q. That didn't concern you that day?
>
> "A. I saw it in a different direction.
>
> "Q. Okay. Are you claiming that anything was said in open court in the presence of Judge Reynolds about eighty-three feet?
>
> "A. That was the basis on all [sic] judgment on our agreement.

1130378

"Q. But there was no way for us to know that or for the Court to know that.

"A. Well, you mentioned seven feet. There was a seven foot difference. We agreed to give them seven more feet. Then you added the one foot diversion.

"Q. All right.

"A. At the very end.

"Q. I don't recall mentioning seven feet. I recall mentioning exactly what is in the order that it was going to be from the boundary line up here on Big Oak Drive to the delta point. Isn't that right?

"A. That's correct."

The last witness in the hearing was Jean Gray. Gray testified that she understood the line described in the settlement agreement to be the line the parties had agreed to on May 30, 2012, for dividing the parcel into two segments and that the agreement was reflected in the order executed by the trial court on June 12, 2012. On cross-examination, Gray was asked whether she knew what Bain and Johnston "thought or believed on May 30" that they were agreeing to, and Gray admitted she did not know their thoughts.

18

On September 26, 2012, the trial court entered an order granting Bain and Johnston's Rule 60(b) motion; that order stated, in pertinent part:

"Testimony being taken on the record on the issue of mistake as to the location of certain points along the waterfront and locations within a certain plat map.

"Order of June 12, 2012, is set aside as [Bain and Johnston] having made mistakes in their understanding of certain locations of points.

"Case is reset for February 26, and February 27, 2013, at 9:00 a.m. for both days of trial."

On October 8, 2012, Gray filed a "Motion for Reconsideration" of the trial court's September 26, 2012, order. In the motion, Gray argued, among other points, that the trial court had erred based on the testimony presented in the September 26, 2012, hearing and that the ruling improperly undermined the parties' confirmation of their understanding of the settlement during the May 30, 2012, hearing. Gray recounted that the reason the parties agreed on the delta point as the reference point for dividing the parcel at the shoreline was because "it was impractical, if not impossible, to make an exact determination" of the footage of shoreline that would be received by each party "due to the meandering

nature of the shoreline." Gray noted that the delta point had not moved and that it was easily located by Speaks for the surveys he performed. Gray argued that Bain and Johnston

> "heard that the terms of the settlement to which they agreed mandated that the location of the boundary line as it entered Lake Martin would be determined solely by reference to the Delta Point and with no consideration being given to shoreline footage. If Bain and Johnston wanted to confirm the actual shoreline footage involved with the common boundary line as mandated by reference to an unambiguous Delta Point, they should have advised the Court that they were not prepared to accept the terms of the settlement at that time. Obviously they did not do so. Based upon the testimony presented by [Bain and Johnston] at the September 26, 2012, hearing, we now know that Bain and Johnston simply attempted to approximate the location of the proposed boundary line based solely upon information which was not discussed in open court and which was not part of the settlement agreement or the Court's June 12, 2012, order. Gray would respectfully suggest that a 'mistake' about a fact which was not discussed in open court and which was not part of the agreement to which the parties assented in open court is not the type of mistake for which Rule 60(b) relief is available."

Bain and Johnston did not file a response to Gray's motion.

On October 9, 2012, the trial court denied Gray's "Motion for Reconsideration." On October 31, 2012, Gray appealed the trial court's disposition of Bain and Johnston's Rule 60(b) motion to this Court. We transferred the appeal to the Court of Civil Appeals. On May 22, 2013, the Court of Civil Appeals

20

1130378

dismissed Gray's appeal as being from a nonfinal judgment.[3]
Gray v. Bain (No. 2120406, May 22, 2013), ___ So. 3d ___ (Ala.
Civ. App. 2013) (table).

A trial on the merits was conducted on September 19 and
20, 2013. Following trial and the submission of arguments by
both sides, the trial court entered an order on November 19,
2013. In that order, the trial court concluded that the
original plat was ambiguous as to the ownership of the parcel
and that Bain and Johnston "have a chain of title for over
thirty years, color of title, possession, tax payment and
deeds with generalized descriptions and testimony that
factually places title in them." Accordingly, the trial court
concluded that fee-simple title to the parcel was to be vested

---

[3]This Court has held that "[a]n order granting a motion
seeking relief from a judgment under Rule 60(b), Ala. R. Civ.
P., is generally considered an interlocutory order because
further proceedings are contemplated by the trial court;
therefore, such an order is not appealable." Ex parte
Overton, 985 So. 2d 423, 424 (Ala. 2007). This Court also has
stated that "'[a] petition for the writ of mandamus is a
proper method for attacking the grant of a Rule 60(b)
motion.'" Ex parte Wallace, Jordan, Ratliff & Brandt, L.L.C.,
29 So. 3d 175, 177 (Ala. 2009) (quoting Ex parte A&B Transp.,
Inc., 8 So. 3d 924, 931 (Ala. 2007)). Gray did not file a
petition for a writ of mandamus, and the Court of Civil
Appeals apparently chose not to treat her appeal as such a
petition; it therefore dismissed Gray's appeal as being from
a nonfinal judgment.

21

in Bain and Johnston. The trial court also concluded that "the original intent of the developers was to attach the disputed real estate to the lot owners so as to give the possessor of the end of the slough the use of both side[s], given the disputed area had no development/usable value."

On December 19, 2013, Gray appealed to the Court of Civil Appeals the trial court's September 26, 2012, order granting Bain and Johnston's Rule 60(b) motion and the trial court's November 19, 2013, order awarding title to the parcel to Bain and Johnston. On December 27, 2013, the Court of Civil Appeals transferred Gray's appeal to this Court due to a lack of subject-matter jurisdiction in that court.

## II. Standard of Review

This Court has held that the decision whether to grant or deny a motion made pursuant to Rule 60(b) is "within the sound discretion of the trial judge, and the appellate standard of review is whether the trial court abused its discretion." Ex parte Dowling, 477 So. 2d 400, 402 (Ala. 1985).

### III.  Analysis

We begin by examining the trial court's September 26, 2012, order granting Bain and Johnston's Rule 60(b) motion because a ruling in Gray's favor as to that order would require reinstatement of the settlement agreement and necessarily moot examination of the trial court's November 19, 2013, order on the merits of ownership of the parcel.  Gray makes several arguments regarding the order granting Bain and Johnston's Rule 60(b) motion, but the one we focus on is Gray's assertion that

> "[a]ny fair reading of the record, when putting things in the light most favorable to Bain and Johnston, would simply indicate that because Bain and Johnston attempted to approximate the location of the negotiated common boundary line by means not authorized under the terms of the settlement, they thought that the common boundary line would be located a few feet further north than actually was the case."

Gray contends that Bain and Johnston's "mistake" was actually a free and deliberate choice they made for which Rule 60(b) is not intended to provide them relief. See, e.g., Ex parte Mealing, [Ms. 2120973, Oct. 25, 2013] ___ So. 3d ___, ___ (Ala. Civ. App. 2013) (stating that "Rule 60(b) is not designed to relieve a party from the deliberate choices he or

23

she has made"); <u>Murphy v. Golden Poultry Co.</u>, 634 So. 2d 1027, 1029 (Ala. Civ. App. 1994) (noting that "[i]t is not the intent of Rule 60(b) to relieve a party from the free, calculated, and deliberate choices he/she has made").

Bain and Johnston answer this argument by contending that they demonstrated through testimony at the September 26, 2012, hearing that at the time they assented to the settlement agreement they simply made a mistake as to where the boundary line dividing the parcel between the parties would be located and that they never would have agreed to the boundary line described in the settlement agreement had they understood its actual location at that time. Bain and Johnston assert that they established the existence of a mistake that entitled them to relief under Rule 60(b).

Even if Bain and Johnston made an honest mistake, the evidence and arguments are unequivocal that they alone made the mistake. Bain repeatedly testified that the mistake at issue was his mistake. Johnston testified that she shared Bain's understanding of the boundary line. There is no suggestion that Gray did not understand where the boundary line would be located at the time the parties reached the

24

settlement, and, in fact, her undisputed testimony confirmed that she understood the terms of the agreement. Thus, the undisputed evidence is that the mistake at issue was a unilateral mistake on the part of Bain and Johnston.

The trial court appears to have incorrectly assumed -- as do Bain and Johnston -- that any mistake as to a material fact of the settlement agreement justified its rescission. "Rule 60(b)(1)[, Fed. R. Civ. P.,] authorizes the court to give relief from a judgment, order, or proceeding for 'mistake, inadvertence, surprise, or excusable neglect,'" but "judgments entered as a result of settlements may be reopened [only] when fraud or mutual mistake is shown." 11 Charles Alan Wright, Arthur K. Miller & Mary Kay Kane, Federal Practice & Procedure § 2858 (2012).[4] The reason for this is that, although a mutual mistake of fact will permit a court to reform or rescind a binding settlement agreement, a unilateral mistake does not justify such relief. "Unilateral mistakes do

_____

[4]"Because the Federal Rules of Civil Procedure were used as a model for Alabama's procedural rules, these 'federal decisions are highly persuasive when we are called upon to construe the Alabama Rules.'" Ex parte Full Circle Distrib., L.L.C., 883 So. 2d 638, 643 (Ala. 2003) (quoting City of Birmingham v. City of Fairfield, 396 So. 2d 692, 696 (Ala. 1981)).

1130378

not support reformation (absent some fraud or misrepresentation). Moreover, one party is not customarily charged to know what is on the other party's mind, so as to concoct some constructive mutual mistake where there is but a unilateral mistake." 27 Richard A. Lord, Williston on Contracts § 70:109 (4th ed. 2003). "As a general rule, rescission is unavailable where a unilateral mistake is unknown to the other party (even though that mistake relates to a basic assumption of a contract and has a material effect on the agreed exchange of performances)." Williston at § 70:111. This Court has explained:

> "We have often had occasion to point out the grounds on which a court of equity will assume jurisdiction to reform written instruments. 'First, where there is a mutual mistake, that is, where there has been a meeting of minds, an agreement actually entered into, but the contract, deed, settlement, or other instrument, in its written form, does not express what was really intended by the parties thereto; and, second, where there has been a mistake of one party, accompanied by fraud or other inequitable conduct of the remaining parties;' and also where there has been a mistake on the part of the scrivener. Of course the mistake must be unmixed with negligence on the part of the party seeking relief."

Ballentine v. Bradley, 236 Ala. 326, 328, 182 So. 399, 400-01 (1938). There was no allegation that Bain and Johnston's

26

mistake was accompanied by fraud or other inequitable conduct on Gray's part. See also <u>Hackney v. First Alabama Bank</u>, 555 So. 2d 97, 101 (Ala. 1989) (citing the <u>Restatement (Second) of Contracts</u> §§ 153 and 154 (1979), and holding that, unlike a mutual mistake of fact, a unilateral mistake will not serve as a basis for avoiding the contract unless the effect of the mistake is such that enforcement of the contract would be unconscionable or the nonmistaken party had reason to know of the mistake or his or her fault caused it). <u>Meyer v. Meyer</u>, 952 So. 2d 384, 391-92 (Ala. Civ. App. 2006) (declining to authorize reformation or rescission of a contract as the result of a mistake that the court concluded was not a "mutual mistake" and relying on § 8-1-2, Ala. Code 1975, which provides as follows: "When, through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, so far as it can be done without prejudice to the rights acquired by third persons in good faith and for value.").

1130378

Federal authorities also concur that only a mutual mistake, and not a unilateral one, permits a court to rescind or reform a binding settlement agreement.

> "In the instant case, ... the district court erroneously concluded that since a mutual mistake of material fact would suffice to warrant reformation of a settlement agreement, a unilateral mistake also constituted permissible reason to do so. Existing precedent, however, dictates that only the existence of fraud or mutual mistake can justify reopening an otherwise valid settlement agreement. 'One who attacks a settlement must bear the burden of showing that the contract he had made is tainted with invalidity, either by fraud practiced upon him or by a mutual mistake under which both parties acted.' Callen v. Pennsylvania R.R. Co., 332 U.S. 625, 630, 68 S.Ct. 296, 298, 92 L.Ed. 242 (1948) (emphasis added); Asberry v. United States Postal Serv., 692 F.2d 1378, 1380 (Fed. Cir. 1982) (same).
>
>> "'If a mistake was made in the present case, it was made by the defendant alone. Unlike a mutual mistake, a unilateral mistake is not sufficient to allow the mistaken party to limit or avoid the effect of an otherwise valid settlement agreement. Kline v. Florida Airlines, Inc., 496 F.2d 919, 920 (5th Cir. 1974); United States v. Bissett-Berman Corp., 481 F.2d 764, 768 (9th Cir. 1973); Virginia Impression Prod. Co. v. SCM Corp., 448 F.2d 262, 265 (4th Cir. 1971)[, cert. denied, 405 U.S. 936, 92 S.Ct. 945, 30 L.Ed.2d 811 (1971)].'
>
> "Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States, 671 F.2d 1305, 1311, 229 Ct. Cl. 434 (1982); accord Mid-South Towing Co. v. Har-Win, Inc., 733 F.2d 386, 392 (5th Cir. 1984) ('In this case, OKC's alleged ignorance ... is, at most, a

28

unilateral mistake. There is no claim that either Mid-South or American Employers' concealed these other surveys or misrepresented their contents, nor that there was any overreaching.'); Swift Chem. Co. v. Usamex Fertilizers, Inc., 490 F. Supp. 1343, 1356 (E.D. La. 1980) ('Whatever the truth is, at best only one of the parties could have been mistaken about the issue. A unilateral mistake about a particular fact is insufficient to reform a contract otherwise properly entered into.'), aff'd, 646 F.2d 1121 (5th Cir. 1981); Albano Cleaners, Inc. [v. United States], 455 F.2d 556, 560 (Ct. Cl. 1972); see also Bowater No. Am. Corp. [v. Murray Mach., Inc.], 773 F.2d [71] at 75 [(6th Cir. 1985)] ('The adequacy of the contract formation [of a settlement agreement] is further supported by the [fact that] ... there was no mutual mistake, nor was there mistake due to fraud which only one of the parties would have known about.') (emphasis added). In the case at bar, there was no mutual mistake or fraudulent misrepresentation."

Brown v. County of Genesee, 872 F.2d 169, 174-75 (6th Cir. 1989). See also Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 46 (2d Cir. 1991) (stating that "the necessary elements for rescission based on mutual mistake [are]: both parties to the release shared the same erroneous belief as to a material fact, and their acts did not in fact accomplish their mutual intent").

The "exception to the general principle denying relief for unilateral mistake [is] when the nonmistaken party knows or has reason to know of the unilateral mistake."

29

28 Williston on Contracts § 70:229.  Such was not the case here.  Gray testified without dispute that she had no idea that Bain and Johnston had a different belief than she did as to location of the boundary line dividing the parcel when the parties agreed to the settlement.

In fact, as Gray observed in her "Motion for Reconsideration," the situation presented in this case reflects one in which the parties who made the mistake simply made an assumption without gathering enough information to confirm that assumption before assenting to the settlement agreement.  In a similar scenario, the United States Court of Appeals for the Fifth Circuit explained:

> "[E]ven if we accept the contention that Davis gave his consent to the release based on a mistake of fact concerning the role of various companies in the alleged wrongdoing, Davis and his lawyers had an obligation to determine the facts through discovery before entering into a broad release of all claims. A party to a settlement who 'has the means in hand of ascertaining the facts, but neglects to [use those means] cannot thereafter have the settlement set aside because of mistake.'  Talbot v. Douglas Moving & Warehouse Co., 228 So. 2d 222, 224 (La. Ct. App. 1969), cert. denied, 255 La. 247, 230 So. 2d 94 (1970)."

Davis v. Huskipower Outdoor Equip. Corp., 936 F.2d 193, 198 (5th Cir. 1991).

Bain and Johnston assert that "[b]efore agreeing to the settlement, and without a map from which to visualize starting points, Mr. Bain did everything he could to verify the place where the new boundary line on Parcel 57 would be in the short space of time available to him." But the "rush" to confirm measurements was self-imposed. There is no reason, and Bain and Johnston offer none, why they could not have declined to agree to the proposed settlement until they felt sure about the location of the boundary line -- if indeed they were unsure about its location. For that matter, there is no reason the settlement could not have been made contingent on the parties' agreement with the second Speaks survey establishing the boundary line dividing the parcel. Bain and Johnston employed neither course of action. Instead, they voluntarily proceeded to enter into a binding settlement agreement that they affirmed in open court, that was memorialized in a court order, and that became a final judgment. The current appeal arises from their request that the trial court undo this agreement and the final judgment resulting therefrom and provide them instead with a full trial on the merits of the dispute in question. In short, Bain and

31

Johnston requested, and the trial court granted, Rule 60(b) relief based on their own unilateral mistake made within the context of a free and deliberate choice to settle a matter that had been pending for 13 years between the parties.[5]

_____

[5]Bain and Johnston contend that the case of Fabarc Steel Supply, Inc. v. Davis, 422 So. 2d 797 (Ala. Civ. App. 1982), supports the trial court's decision to grant them Rule 60(b) relief. In Fabarc, a trial court set aside a worker's compensation consent judgment under Rule 60(b). Ironically, in their summary of the facts in Fabarc, Bain and Johnston note the very fact that distinguishes that case from their situation:

> "The claimant had injured his fingers on the job, but while he was being treated for his injuries, an injection into his shoulder allegedly injured his shoulder to the point that he was totally disabled. The treating physician told the worker and his employer that the shoulder was the result of bursitis. Because of this, the worker went ahead and settled his case for approximately $1500.
>
> "After the worker learned that the problems with his shoulder were work related, he moved to set aside the settlement, which the trial court granted on the grounds of mutual mistake as to the true extent of Mr. Davis' injuries."

The Court of Civil Appeals in Fabarc affirmed the trial court's judgment, likewise noting the existence of a mutual mistake:

> "In the instant case, plaintiff had been told by Dr. Veach that his shoulder pain was the result of bursitis. After contacting an attorney, he was advised that the injury to his fingers would be fairly compensated by the settlement agreement. Although plaintiff was totally disabled by the pain

32

"'The law favors the amicable settlement of controversies, and it is the duty of courts rather to encourage than to discourage parties in resorting to compromise as a mode of adjusting conflicting claims.'" Tatum v. Cater, 270 Ala. 445, 448, 119 So. 2d 223, 225 (1960) (quoting 11 Am. Jur. Compromise and Settlement § 4). In this case, the parties apparently had been attempting to settle their dispute over the ownership of the parcel for 13 years. When the parties finally settled, they affirmed their assent to the terms of the settlement in open court following specific and repeated inquiries from the trial court.

Based on the foregoing, we conclude that the trial court erred in granting Bain and Johnston's Rule 60(b) motion that set aside the binding settlement agreement between the parties. We therefore reverse the September 26, 2012, order

---

in his shoulder and arm, everyone else involved apparently relied on Dr. Veach's opinion that such pain was not related to plaintiff's injury to his fingers. In considering the 60(b) motion, the court could have determined that plaintiff, uneducated and not qualified to relate the shoulder pain to the on-the-job injury, accepted the settlement in reliance on representations that the settlement amount was all the money to which he was entitled."

Fabarc, 422 So. 2d at 799 (emphasis added).

granting Bain and Johnston's Rule 60(b) motion. As we noted at the outset of our analysis, this result also necessarily means that the trial court should not have entertained a trial on the merits. Accordingly, the trial court's November 19, 2013, order resulting from that trial and awarding the parcel to Bain and Johnston is due to be set aside. On remand, the trial court is instructed to vacate its November 19, 2013, order and to reinstate its June 12, 2012, judgment approving the parties' settlement agreement.

REVERSED AND REMANDED WITH INSTRUCTIONS.

Main and Bryan, JJ., concur.

Moore, C.J., and Bolin, J., concur in the result.